THE BANK OF MARION, Plaintiff-Appellee, *v.* ROBERT "CHICK" FRITZ, INC., Defendant-Appellant.

(No. 71-305;

Fifth District—January 18, 1973.

Sam S. Pessin, of Belleville, for appellant.

August L. Fowler, of Fowler & Novick, of Marion, for appellee.

SUPPLEMENTAL OPINION ON REHEARING

Mr. PRESIDING JUSTICE GEORGE J. MORAN delivered the supplemental opinion of the court:

Defendant appeals from the trial court's entry of judgment for the plaintiff in the amount of $25,567.92 notwithstanding a jury verdict for the defendant. The trial court also conditionally ruled that in the event of a reversal on appeal that the plaintiff be given a new trial for assessment of damages only or a new trial on all the issues. Defendant also appeals from this ruling.

The Bank of Marion, hereinafter referred to as "the bank", sued Robert "Chick" Fritz, Inc., hereinafter referred to as "Fritz", a beer distributor, for an amount of money representing what was owed on the bank's loan to a contractor, Diversified Contractors, hereinafter referred to as "Diversified", for work on a warehouse it was building for Fritz. The contract between Fritz and Diversified had been entered into prior to the advance of money, and Fritz was not a party to the negotiation of the loan.

The bank filed suit against Fritz, alleging that on or prior to October 15, 1969, Fritz had entered into a contract with Diversified to construct for Fritz a beer warehouse near Mascoutah, Illinois; that Diversified sought to borrow the funds required for the construction from the bank; that the bank informed Diversified that in order to furnish the funds it would be necessary that Fritz make the payments due Diversified under the contract directly to the bank; that Fritz, as an inducement to the bank to furnish the money to Diversified, executed and delivered to Diversified for delivery to the bank, the following instrument, hereinafter referred to as "Exhibit A":

"Certification of Contract

Bank of Marion
Public Square
Marion, Illinois

(Attn: Mr. Oscar Schafale)

Re: Construction Contract on Beer Warehouse and Office, Highway 177 West, Mascoutah, Illinois.

This certification of contract is to confirm the contract between our company and Diversified Contractors, Inc., for the contract amount of $111,664.00 plus extras to date of $3,745.00 for a total of $115,409.00. The total amount plus any other extras and/or deletions will be made jointly to the Bank of Marion and Diversified Contractors, Inc.

(Signed) Robert 'Chick' Fritz, Inc.
Mascoutah, Illinois
By: Robert Fritz."

that in reliance on the agreement, the bank loaned Diversified the sum of $64,700.50; that Fritz breached its agreement to pay the contract amounts jointly to the bank and Diversified; that as a result, the funds due under said contract were not applied to the loans made by the bank to Diversified to the damage of the bank in the sum of $34,697.28.

In its answer to the bank's complaint, Fritz admitted the execution and delivery of the instruction in question, but denied it was made for the purpose of inducing the bank to furnish funds to Diversified.

The jury rendered a verdict adverse to the bank but the trial court entered a judgment notwithstanding the verdict pursuant to the bank's post trial motion. Alternatively, the trial court granted the bank a new trial in the event the case should be reversed.

Oscar Schafale, the President and Chairman of the Board of the bank testified over the objection of Fritz that on September 5, 1969 he had a conversation with one Robert Morgan, Vice President of Diversified, concerning the beer warehouse that was being constructed for Fritz. Over the objection of Fritz he was permitted to testify that Morgan approached him for a loan on the warehouse; that Diversified wanted to borrow money from time to time against construction and that the only way the bank would make the loan was that the bank would need a commitment from Fritz wherein Fritz would make all the checks on the construction to Diversified Contractors and the Bank of Marion. He further testified that Morgan told him he needed the money and would like to have an advance so he agreed to advance him $6000 with the stipula-

tion that before he got any more money he would have to get a commitment from Fritz. He then had Morgan, on behalf of Diversified, sign a promissory note to the bank for $6000. He marked the note in the margin, "Advance No. 1 on the Chick Fritz Account". Later, on October 10, 1969, Morgan brought in Exhibit A, signed by Fritz, and a second note was executed in the amount of $6,592.

Altogether, seven loans, evidenced by Diversified's notes, were made by the bank to Diversified on the warehouse contract. Each had a marginal notation of the number of the advancement. These notes are summarized as follows:

| Advance Number | Note Number | Date | Maturity | Amount |
|---|---|---|---|---|
| 1 | 8791 | 9/5/69 | 10/20/69 | $ 6,067.50 |
| 2 | 8927 | 10/10/69 | 2/10/70 | 6,592.00 |
| 3 | 8955 | 10/17/69 | 1/17/70 | 6,135.00 |
| 4 | 9014 | 10/31/69 | 12/30/69 | 15,935.50 |
| 5 | 9073 | 11/14/69 | 1/14/70 | 28,420.00 |
| 6 | 9151 | 12/4/69 | 2/4/70 | 10,150.00 |
| 7 | 9188 | 12/12/69 | 2/12/70 | 4,060.00 |

The first four notes were paid. The balance due on the remainder is $22,218.40, plus interest.

Robert Morgan testified that Diversified had entered into a contract for the construction of the warehouse in question on August 5, 1969; that sometime in October he took the instrument in question to Fritz for his signature; that Fritz did not have anything to do with the typing or preparation of the instrument; he thought it was typed in Diversified's office in Carbondale; somebody gave it to him already typed. He did not recall whether he left a copy of the instrument with Fritz when he obtained Fritz's signature. The witness further testified that the reason the instrument was being presented to Fritz for signature was because the bank told him that it had to have a commitment for the checks to be made jointly, or it wouldn't lend the money. He stated that he asked Fritz to sign the instrument but he did not remember the conversation; he did not recall telling Fritz why he needed the instrument signed; he did not know how long he and Fritz were together when the instrument was signed, but he did know that Diversified would not get the money unless the instrument were signed.

Fritz testified that he signed the instrument in question when Morgan of Diversified came to the jobsite while Fritz was busy and told Fritz that the bank wanted to know if Diversified was working and what they were doing. He signed the instrument at Morgan's request without

looking at it. Morgan told him their bank wanted to know what they were working at. Fritz at no time asked Morgan what he signed and never called the bank. He did not know the bank was lending Diversified money on his contract. Morgan did not tell Fritz that Diversified was borrowing money from the bank and Fritz kept giving Diversified money as they needed it.

Fritz issued three personal checks payable to Diversified because he said Diversified did not have any money. The first one was dated November 5, 1969 in the amount of $50,067.09. The next one was on December 21, 1969 for $15,000. The third one was dated February 10, 1970 for $30,000. All of the checks were made payable to Diversified and were deposited by Diversified in its account at the Bank of Marion.

At the end of the construction work, Diversified advised Fritz that it owed its subcontractors more than the balance due from Fritz. To clear himself of this potential liability, Fritz entered into a tri-partite agreement with the contractor and subcontractors to pay the latter *pro rata* with the subcontractors accepting Diversified's notes for the balance.

The bank contends that Exhibit A was a clear and unambiguous promise to pay the total contract price due Diversified to the bank and Diversified jointly, and since the language was unambiguous, the construction of the instrument was a question of law for the court and should not have been submitted to the jury. It properly states the law to be that where there is no ambiguity in the terms of a written contract, the instrument itself affords the only criterion of the intention of the parties.

If Exhibit A was an unambiguous contract complete on its face, which purported to embody the whole agreement between the parties, the bank's contention would be sound, but it obviously is not such an instrument.

Exhibit A, described as a commitment, is undated, recites no consideration, contains no reference to anything done or to be done by plaintiff and details no terms. On its face it is no more than a unilateral offer. Was this offer definite enough so that acceptance could be completed by the act of loaning the money to Diversified without further proof of the intention of the parties? An offer must be so definite in its terms or require such definite terms in its acceptance that the promises and performances to be rendered by each party are reasonable and certain. (17 Am.Jur.2d, par. 76.) Since Exhibit A was not such an offer, the advancement of money by the bank to Diversified without the addition of parol evidence would be insufficient to prove a contract.

However, the bank actually sought to prove the existence of a contract, not only by Exhibit A, but also by parol evidence. "A contract partly written and partly verbal is one in parol. Accordingly, since, in

such case, there is only a 'partial integration' of the entire contract, the rule is that parol evidence to prove the part not reduced to writing is admissible, although it is generally inadmissible as to the part reduced to writing. In most cases, the admixture of parol and written evidence on the question of the making of a contract which is partly oral takes the question to the jury." 17 Am.Jur.2d, par. 68, p. 408.

Fritz contends that there was no evidence of a binding contract between the parties because there was no proof that Fritz ever had any intention of entering into a contract with the bank and therefore there could be no meeting of the minds or mutual agreement between the parties, and that the bank relies not upon what was proved to be the agreement of the parties, but what was agreed upon between Diversified and the bank. We agree.

● 5-7 It is elementary that in order to constitute a contract between two parties, there must be mutual assent by the contracting parties on the essential terms and conditions of the subject about which they are contracting. Therefore, in order to constitute a contract between the bank and Fritz, there must have been a mutual agreement between the bank and Fritz that Fritz would pay all money due under the Diversified contract jointly to the bank and Diversified, and that in consideration thereof, the bank loaned money to Diversified. The general rule is that the party seeking enforcement of an agreement has the burden of establishing the existence of the agreement. It also is well settled that before any agreement can exist, there must be an offer and acceptance. *C. Iber & Sons, Inc. v. Grimmett*, 108 Ill.App.2d 443, 248 N.E.2d 131.

■■■■ In order that there may be an agreement, the parties must have a distinct intention common to both and without doubt or difference. Until all understand alike there can be no assent and therefore no contract. (17 C.J.S., par. 31, p. 635.) The intention of the parties must in some way be communicated, since a person's intention can be ascertained by another only by means of outward expressions such as words and acts. An intention not expressed, not communicated, or withdrawn before communicated is inoperative and immaterial to the question of the agreement. The same is true of an intention communicated only to a third person. (17 C.J.S. par. 33, p. 643.) "A contract cannot be based upon a statement of one party to which the other party does not give assent." *Bladel v. Carroll*, 336 Ill. 168 at 171.

■■ If there was a distinct intention common to both of the parties and communicated to each of them in some way, it must have been evidenced by the acts or words of the parties or both. The bank argues that since it is undisputed that it relied on Exhibit A and would not have advanced the money to Diversified without it, there is no question but

that Fritz is liable to it as a matter of law. If there was evidence that the bank's intention had been communicated to Fritz at the time he signed the exhibit or at the time the bank commenced loaning the money, the bank would have a valid argument, but since there was no proof of communication of the bank's intention to Fritz, there was no proof of a valid contract between them. *Bladel v. Carroll*, 336 Ill. 168.

The bank contends that the law enunciated in the case of *Central National Bank and Trust Co. of Rockford v. Consumers Construction Co.*, 5 Ill.App.3d 274, 282 N.E.2d 158, is dispositive of this case because the facts are similar. We disagree. There is a significant difference between that case and the present one. In *Central National* it is undisputed that Consumers, who signed the series of letters addressed to the bank, knew they were to be used for the purpose of inducing the bank to make the loans. The letters in *Central National* were letters from Consumers and addressed to the bank with prior knowledge of Consumers and for the express purpose of inducing the loans. They informed from time to time how much money had been earned. About 25 letters were written by Consumers who sent joint checks to the bank and the subcontractor.

Then, too, each of the letters in *Central National* stated certain amounts then due the subcontractor would be paid to plaintiff and subcontractor jointly. The letters indicated the money payable had already been earned and was due. None of these facts or circumstances are present in the case at bar. The evidence in the case at bar does not prove that Fritz signed the paper in question with the intention or purpose that it was to induce the bank to make any loan to Diversified.

■■■ However, assuming that there was an evidentiary basis for a jury to conclude that there was a contract between the bank and Fritz, there was nothing in the instrument by itself that compelled such a conclusion. The instrument, various conversations and conduct of the respective parties (being the circumstances) were all matters in evidence at the trial and presented an issue for the jury to decide as to whether or not there was a contract as alleged by the bank. If a contract has to be made out partly by letters and partly by evidence of conversations concerning which there is not entire agreement as to what was said or the circumstances under which the utterances were made, the question of whether there was a contract, as well as, if so, what it was, is a question of fact for the jury. *Trustees of Schools of Township 42 North v. Schroeder*, 2 Ill.App.3d 1009, 278 N.E.2d 431.

■■ The trial court not only entered judgment for plaintiff notwithstanding the jury verdict, but also entered alternative orders if this case should be reversed, granting a new trial, first, on the issue of damages only, and second, on the entire case. It is the duty of this court, if it

determines that the unconditional rulings were erroneous, which it has so determined, to review and determine the conditional rulings. Civil Practice Act 68.1 (6).

██ We find there is no reasonable basis for a new trial being ordered either on the issue of damages or on the entire case. The judgment of the trial court is reversed and the jury's verdict is reinstated.

Judgment reversed and jury's verdict reinstated.

EBERSPACHER and CREBS, JJ., concur.