ALTER & SONS, INC., an Iowa corporation, Plaintiff,

v.

UNITED ENGINEERS AND CON-STRUCTORS, INC., a Delaware corporation, Defendant.

No. RI–CIV–72–33.

United States District Court, S. D. Illinois, N. D.

Nov. 29, 1973.

Charles G. Rehling and John S. Gosma, Davenport, Iowa, for plaintiff.

James T. Otis and Kenneth R. Mischner, Chicago, Ill., Hubbard B. Neighbour, Moline, Ill., for defendant.

## DECISION AND ORDER

ROBERT D. MORGAN, Chief Judge.

Plaintiff's complaint prays damages against the defendant for the breach of an alleged contract for the sale to defendant of certain pumping equipment. Defendant answered, generally denying the allegations. On the date set for a bench trial of the cause, defendant submitted a motion for leave to file an amended answer, pleading the statute of frauds as a defense to the complaint. That motion is under advisement with the case. The cause is before the court on the pending motion, the evidence adduced at the trial, and upon proposed findings of fact, conclusions of law, and briefs submitted by the respective parties.

The suit arose out of the following stipulated, or wholly uncontested, facts.

In mid-summer of 1972, General Electric Company, hereinafter "G.E.," was the principal contractor engaged in the construction of a nuclear power generating plant at Cordova, Illinois, for Commonwealth Edison Company. Defendant, a Delaware corporation, having its principal place of business in a state other that the State of Iowa, was employed by G.E. as the supervising contractor at the construction site.

Plaintiff is an Iowa corporation, with its principal place of business in Davenport, Iowa.

As of the time critical to this litigation, defendant previously, from time to time, had purchased substantial quantities of equipment from plaintiff for use in construction of the plant.

On Wednesday, July 5, 1972, Mr. Patton, the field purchasing agent for defendant, telephoned plaintiff to inquire about procurement of an emergency pumping system for the power plant. Following that telephone contact, arrangements were made for an agent of plaintiff to meet with defendant's officials at the plant site on the following morning to discuss the requirements. On that morning, Thursday, July 6, Mr. Vollrath, a sales representative for plaintiff, met at the plant site with Mr. Patton and Mr. John King, the latter being the project superintendent for defendant at the power plant. At that meeting, plaintiff's agent was advised that defendant would require two, or possibly three, portable, diesel-powered pumps, each capable of pumping 2,000 gallons per minute, and a quantity of high pressure hose sufficient to deliver given quantities of water, under given pressures, to various locations within the power plant. King described to Vollrath the specifications for equipment required by defendant, and supplied him with a handwritten sketch indicating the distances to be traversed between the proposed pumping site and the plant areas needed to be serviced thereby, and the required pressures and volumes of water discharge required at such locations within the plant. Defendant's agents also informed Vollrath that the equipment would have to be delivered at the plant not later than Monday, July 10, 1972, the fourth succeeding calendar day, with a weekend intervening.

Plaintiff was not at any material time advised as to either the specific purpose of the equipment or the crucial significance of the July 10 delivery condition. It now appears that operation of the plant requires substantial quantities of water to cool the nuclear reactors therein employed. In June, 1972, a breakdown of a part of the permanent water supply system had occurred at the plant. Because the cooling process is critical to operation, the Atomic Energy Commission had forbade operation of the plant until an auxiliary pumping system was

available for emergency use in the event of any future failure. The specific delivery date was imposed as a condition for purchase in order that defendant might begin a previously scheduled shakedown operation of the plant immediately after July 10.

During those conversations on the morning of July 6, Vollrath showed King and Patton pumps displayed in a Hale Pump Company catalog, which were anticipated to be adequate to meet the defendant's needs. He estimated that the pumps displayed in the catalog would cost approximately $12,000 each. There was no other discussion related to the probable total cost of the equipment which defendant required. In that meeting and in subsequent telephone conversations the same day between Alter representatives and Patton, the Alter people recommended that metal pipe be used, at least in part, in place of the high pressure hose. Patton stated, in effect, that the system had to be completely portable for convenient storage when not in use, and that they would require the high pressure hose as a condition of sale.

On the same afternoon Alter representatives were advised by the Hale Company that Hale could not deliver the required pumps within the time limitation. Patton was advised by telephone of that fact and told that Alter would contact other suppliers to attempt to obtain the equipment required. Also, during the course of that afternoon, Alter was advised that the defendant would definitely require three pumps, each with the capacity of 2,000 gallons per minute previously specified. As the afternoon of July 6 progressed, Alter representatives, in effect, followed the sun across the country telephoning possible suppliers, working westward from the East coast of the United States. In the late afternoon, Tom Alter, plaintiff's president, telephoned a Mr. Bradford at Stang Hydronics, Inc., in Orange, California. Bradford advised him that Stang could supply: two pumps, which Stang could modify to meet the two

thousand gallons-per-minute and the point-of-discharge specifications, and two smaller pumps, which, when modified, would compensate for the third pump required, and that Stang could obtain the high pressure hose required to fill defendant's needs. He also then advised Alter that a fifth pump, a primer pump, would be necessary to render the other pumps operable. Patton was advised immediately thereafter by telephone of the equipment which Stang could supply. In that conversation Mr. Patton gave Mr. Alter a purchase order number and instructed him to order shipment of the necessary equipment. Definite conditions of the order were specified that the pumps be diesel driven and mounted on wheels for portability, that the hose be cut into lengths suitable for facile handling and fitted with the proper connectors, and that delivery of the whole package be made not later than July 10, 1972. Upon receipt of those instructions, Alter telephoned Bradford and ordered immediate work and shipment.

To conform the pumps to the plaintiff's requirements it was necessary to modify the impellers to obtain the required discharge and pressure, to equip the pumps with diesel engines and to mount the same on wheel carriages. The impeller modification was to be accomplished in California, whereupon the pumps were to be shipped to Omaha, Nebraska, to a Stang outlet, for fitting with diesel engines, from which point they were to be shipped to plaintiff for mounting on the carriages. The hose was to be obtained by Stang from several sources, but principally from a supplier in Houston, Texas.

There is a dispute in the testimony as to whether on the late afternoon of July 6 a price for the package was mentioned. Mr. Alter testified that he advised Patton at that time that he could not give him a cost figure, but he would estimate that the total package could cost as much as $200,000. Patton denies that any figure was mentioned at that time, but he affirmed by his testimony that

he did instruct Alter to order the equipment to be shipped on condition that it be delivered at the Cordova site not later than July 10.

In the late morning of Friday, July 7, Alter was advised by Bradford that the price of the package to plaintiff was about $155,000. Plaintiff applied a markup of approximately 35% and advised Patton that the total cost of the equipment to United would be $205,450. At about midafternoon Patton telephoned Alter and requested that shipment of the equipment be delayed until further notice. Mr. Alter than telephoned Bradford and was told that all of the pumps except the primer pump had already been shipped and that the hose had been processed and was then enroute. In view of the fact that all the pumps except the primer were on the way, Alter advised Bradford to ship the primer pump, because it was the key to operation of the whole system. Mr. Patton was advised immediately as to that status. The next contact between Mr. Alter and Patton was had at about 6 o'clock in the evening of the same day, July 7, when Mr. Alter returned a telephone call which Patton had made to Alter's home at about 4 o'clock in the afternoon. Mr. Alter was then advised that defendant would not accept delivery of the equipment and that shipment thereof should be halted. That telephoned advice was confirmed by a telegram from defendant, by Mr. Patton, which was delivered to Mr. Alter about 7:30 p. m. that day.

Mr. Alter immediately advised Bradford, by telephone and follow-up telegram, to intercept the shipments of the equipment and have the same returned to the respective sources of supply. Although Bradford had initially advised Alter that the order was non-cancellable, he did then intercept and obtain the return of the respective shipments to their points of origination.

In due course thereafter, plaintiff received from Stang an invoice for costs incurred by that company in the cancellation of the order. Such costs were substantially comprised of shipping costs incurred, labor costs of the several suppliers, and the costs of reclamation and restorage of the hose contained in the order. The invoice contained no claim for lost profits. Mr. Alter testified that that invoice was accepted by plaintiff as a legal liability, but that the same remained unpaid at the time of trial because of plaintiff's financial limitations.

Defendant's agents testified that defendant rejected delivery of the equipment because it was ordered to do so by G.E. They further testified that plaintiff had never been advised by defendant that the order for the equipment was subject to G.E.'s approval. Both King and Patton testified that the cancellation was solely because of G.E.'s direction, and that, absent that direction, they considered the transaction a binding purchase order. The latter testimony is fortified by the fact that defendant had, prior to its cancellation, begun the preparation of a written purchase order for the equipment. That writing was never delivered to plaintiff.

The manner of handling the transaction did not differ from prior transactions between plaintiff and defendant. It had been customary practice for defendant to orally deliver to plaintiff a purchase order number and advisement as to materials needed, with that oral arrangement ultimately embodied in a written purchase order delivered to plaintiff. Plaintiff had never dealt with G.E. in connection with any order related to the Cordova project, and had never been advised that G.E. had any voice in dealings between itself and defendant.

The evidence related to the establishment of a fair market value of the equipment on July 7, 1972 is limited to testimony adduced by plaintiff. In that regard, Mr. Alter testified that the equipment would not have been readily resalable to other customers because of modifications made therein to meet defendant's specifications. He further

testified that resalability would depend upon finding another customer whose specifications and needs would coincide with those imposed by defendant's specifications, which might entail a waiting interval measured in years. The modification reference related to:

a. The fact that the impeller in the pumps had been modified to meet defendant's needs; and

b. The fact that the hose had been cut into lengths required by defendant's needs and fitted with high pressure couplings. The sections of hose were salvageable by severing the end couplings therefrom. Once severed, the couplings were not reusable.

## THE ISSUES

The issues before the court for decision are: 1. Whether there was a sales contract between the parties; 2. Whether enforcement of the contract is barred by the Statutes of Fraud; and 3. The amount of plaintiff's damages, if any.

## FINDINGS OF FACT

1. Material stated as fact in the foregoing narrative statement is herein included as additional findings of fact.

2. As of the early evening of July 6, 1972, the parties had agreed on the specifications and identity of equipment to be supplied by plaintiff to defendant, on the conditions relating to a sale of such equipment, on the date and manner of delivery of such equipment to the Cordova site, and on the scope and extent of plaintiff's undertaking with relation to modification and conformance of such equipment to defendant's specifications. Determination of the price of such equipment to defendant was the only element of the sale agreement then left for later determination.

3. In all of its communication with plaintiff, defendant stressed only the factors of its requirements and that the July 10 delivery date be met. There is no evidence that there was ever any definitive discussion related to the antici-

pated cost of the high pressure hose. The testimony of all witnesses is consistent. There is nothing to indicate any inquiry by defendant at any time as to the anticipated cost of the total package. An estimated price was stated by plaintiff with reference to the Hale pumps. When advised that those pumps were not available, Patton requested that other pumps be sought. When advised as to the equipment which Stang could supply, Patton is not shown to have made any inquiry as to the cost of the Stang pumps or the cost of the hose. The point on which all witnesses agree is that Patton, when advised that the Stang package was obtainable, supplied Mr. Alter with an order number and directed that the equipment be ordered for July 10 delivery. If Patton's testimony that no price estimate was mentioned on the evening of July 6 be accepted, that testimony, in conjunction with his further testimony that he then directed Mr. Alter to order shipment immediately, makes necessary the inference that defendant was stressing the condition of delivery by July 10, regardless of cost. It must be inferred from all of the evidence that defendant did intend to enter into a purchase agreement, and did enter into a purchase agreement for the equipment, with the element of price open for later determination.

4. A preponderance of the evidence requires the inference, and the court finds that at that time Mr. Patton was advised orally as to an anticipated price of as much as $200,000, and that, being so advised, he supplied the order number and instructed plaintiff to order the equipment for delivery on or before July 10, 1972.

5. The testimony of defendant's agents, Patton and King, requires the finding that defendant admits that a sales agreement did exist between the parties from and after the aforementioned conversation between Alter and Patton on July 6, 1972.

6. Plaintiff had no notice of any kind that its agreement was to be subject to approval by G.E., and plaintiff

acted in all respects in good faith in relying upon that agreement.

7. Plaintiff's acts were in all respects in conformity with the agreement between the parties. The equipment ordered by it thereunder fully complied with the specifications and requirements of defendant as communicated to plaintiff by Patton and King.

8. Defendant did cancel and repudiate that agreement; and there is no factual basis to justify that action.

9. Prior to cancellation of the agreement, the equipment had been substantially modified to conform to defendant's specifications, and as so modified it was not then readily resalable to buyers other than the defendant.

10. Plaintiff sustained actual special damages in the amount of $27,740.15, which were incidental to defendant's cancellation of the agreement.

11. Plaintiff's anticipated profit was a reasonable and normal profit margin and markup for equipment of the type here involved; and, upon the evidence here, plaintiff expecting upon full performance to absorb some additional expenses which were not incurred, plaintiff's anticipated profit is computed to be the sum of $48,500.

## CONCLUSIONS OF LAW

1. The court has jurisdiction over the parties and subject matter of this litigation.

2. The issues must be decided by the application of the substantive law of Illinois. DeKorwin v. First National Bank of Chicago, 318 F.2d 176 (7 Cir., 1963). The applicable substantive law is the provisions of the Uniform Commercial Code. Ill.Rev.Stat.1971, ch. 26, §§ 2–101 et seq.

3. The applicable statute provides that:

"(1) A contract for sale of goods may be made in any manner sufficient to show agreement, including conduct by both parties which recognizes the existence of such a contract.

"* * *

"(3) Even though one or more terms are left open a contract for sale does not fail for indefiniteness if the parties have intended to make a contract and there is a reasonably certain basis for giving an appropriate remedy." Ill.Rev.Stat.1971, ch. 26, § 2–204.

When the parties so intend, a contract for the sale of goods can be concluded even though the price of the goods sold is not settled. Ill.Rev.Stat. 1971, ch. 26, § 2–305.

4. The intention of the parties with reference to the issue whether a contract for sale was made must be determined in the light of the facts and conduct of the parties.

The salient inference from the actions of defendant's agents on July 6, 1972 is that the imperative factors in their minds were that equipment be obtained and that delivery thereof be effected not later than July 10, 1972. They presented their request to plaintiff in the emergency atmosphere inherent in that almost impossible time limitation. All elements of a sales agreement were mutually agreed between the parties, except that the sales price was left open.

5. A sales agreement was concluded between the parties on the early evening of July 6, 1972, when Patton gave Mr. Alter a purchase order number and directed him to order the equipment for July 10 delivery. No other conclusion is consistent with the facts proved. Patton knew and intended that plaintiff would commit itself for the purchase, modification and shipment of the equipment upon the strength of those representations. Defendant's belated concern with the lack of agreement as to sales price is inconsistent with its overriding concern at that critical juncture in time that its equipment needs be filled on an emergency basis. A sales agreement was made, despite the fact that the sales price remained to be determined.

6. Defendant is not aided by its citation of Illinois case law. No case cited

is even nearly factually parallel to this case. *E. g.*, Iber & Sons, Inc. v. Grimmett, 108 Ill.App.2d 443, 248 N.E.2d 131 (1969); Euclid Engineering Corp. v. Illinois Power Co., 79 Ill.App.2d 145, 223 N.E.2d 409 (1967); Bank of Marion v. Robert "Chick" Fritz, Inc., 9 Ill.App.3d 102, 291 N.E.2d 836 (1973).

7. While the applicable Statute of Frauds provides that an oral contract for the sale of goods for a price of $500 or more is generally not enforceable [Ill.Rev.Stat.1971, ch. 26, § 2–201(1)], such a contract is enforceable "if the party against whom enforcement is sought admits in his pleading, testimony or otherwise in court that a contract for sale was made * * *." Ill.Rev.Stat. 1971, ch. 26, § 2–201(3).

8. As a matter of fact and as a matter of law, defendant, through the testimony of both its agents, Patton and King, admitted the existence of a sales contract for the equipment involved. The Statutes of Fraud, therefore, cannot be a defense to this cause.

9. As hereinabove found, a valid sales contract existed between the parties which defendant repudiated without any legal justification; and plaintiff is entitled to its damages for that breach of contract.

10. Since, as hereinabove found, the equipment involved was not readily resalable and a market price therefor cannot be ascertained, plaintiff's damages must be measured by the profit which it would have made from full performance by defendant, plus any incidental damages which it sustained as a result of defendant's repudiation of the Contract.[1]

11. Plaintiff is entitled to judgment in the aggregate amount of $76,240.15, that being the sum of its anticipated profit and incidental damages as hereinabove found.

12. Any legal conclusions contained hereinabove in the findings of fact and narrative exposition are herein incorporated as additional conclusions of law.

---

1. "If the measure of damages provided in subsection (1) [the difference between market price at time of tender and the contract price] is inadequate to put the seller in as good a position as performance would have done then the measure of damages is the profit * * * which the seller would have made from full performance by the buyer, together with any incidental damages * * *." Ill.Rev.Stat.1971, ch. 26, § 2–708(2).