31 Ill. App.3d 6 (1975)
333 N.E.2d 587
PATRICK J. FLEMING, Plaintiff-Appellee,
v.
PARKVIEW COLONIAL MANOR INVESTMENT COMPANY, INC., Defendant-Appellant.
No. 74-399.
Illinois Appellate Court  Fifth District.
August 5, 1975.
*7 Dixon & McDonnell, of Belleville, for appellant.
Fleming & Fleming, Ltd., of O'Fallon, for appellee.
Judgment reversed.
Mr. JUSTICE EBERSPACHER delivered the opinion of the court:
This is an appeal by the defendant, Parkview Colonial Manor Investment Company, Inc., from a judgment for $14,500 entered in favor of the plaintiff, Patrick J. Fleming, by the circuit court of St. Clair County on plaintiff's action for damages arising out of an alleged breach of contract.
The plaintiff is an attorney. In the latter part of 1967 or the early part of 1968, he became a member of the boards of directors of two corporations, the defendant corporation and Parkview Manor, Inc., which owned and operated a nursing home in O'Fallon. At this time the stock in each company was owned by Philip Schildknecht and Neil Gavin.
In early 1968, the board of defendant corporation discussed the possibility of enlarging the nursing home. A 114-bed addition was contemplated and the plaintiff was asked to explore the possibilities of financing the proposed addition. The plaintiff submitted a proposed written agreement to the board, which provided for the payment of a $14,500 fee in the event the plaintiff was able to obtain permanent and construction financing for the planned expansion. While the written agreement was neither signed, nor offered into evidence, both the plaintiff and Philip Schildknecht testified that the board had orally agreed to the plaintiff's proposal.
*8 According to Philip Schildknecht, this proposal obligated the corporation to pay the plaintiff a fee of $14,500 in the event he obtained permanent and construction financing in the amount of $1,450,000, $840,000 to finance the construction and $600,000 to pay off an existing loan. The actual cost of construction was, at that time, estimated to be $700,000. The excess of $140,000 was included to pay for additional expenses, including a commitment (or finder's) fee and the $14,500 fee of the plaintiff. Fifty percent of the plaintiff's fee was to be paid when the board "knew that we had it [the loan] for sure and the balance [was to be paid] whenever the construction was done."
In a letter dated December 20, 1968, John H. Poelker, then comptroller of the city of St. Louis, advised Philip Schildknecht that,
"You may consider this letter as a commitment on behalf of the Firemens Retirement System of St. Louis and/or the Alternative Police Retirement System of St. Louis to make a First Mortgage Loan on the expanded Parkview Colonial Manor Nursing Home in the amount of $1,450,000 due in twenty years at interest rate of 7 1/4% to be taken down December 1, 1970; subject to the following conditions:  "
Included among the six enumerated conditions was the following condition:
"Further, this agreement shall provide that the operating company cannot be sold nor the agreement be subject to sub-contract without our approval."
The plaintiff identified this letter as the commitment he had obtained through one James Schmitt of "Mississippi Mortgage Company." A fee of $40,000 was paid by the defendant corporation to Schmitt's Company for his services in obtaining this commitment.
Subsequently, one Harvey Friedman, an officer of Bernard Nursing Homes, Inc., of St. Louis, became interested in the O'Fallon nursing home and, after preliminary discussions, made a written offer to purchase all of the stock in each of the nursing home corporations. This offer contained the following clause:
"It is understood and agreed that the permanent commitment for the 114-bed addition to the nursing home issued by the Comptroller of the City of St. Louis and the pending construction loan for $840,000.00 with the First National Bank of O'Fallon will be transferred to the purchasers subject to the approval of both lenders."
On February 15, 1969, Gavin and Schildknecht accepted Friedman's offer. This offer had contained a provision:

*9 "That there are no contracts in effect with either of said corporations which cannot be terminated on thirty (30) days notice, excepting drug and ambulance contracts."
This provision was accepted by Gavin and Schildknecht, with the following addendum:
"and a pharmacy contract to be entered into for a term of two years from closing in a form satisfactory to us."
The plaintiff was privy to the terms of the foregoing offer and acceptance. In fact, on February 27, 1969, and again on March 4, 1969, the plaintiff notified Mr. Poelker of the agreement for sale of the corporate stock and requested his consent to the assignment of the commitment of December 20, 1968, from Schildknecht to the purchaser, Bernard Nursing Homes, Inc. On March 6, 1969, Mr. Poelker advised the plaintiff that, "We do not under the present circumstances contemplate assigning the commitment for the permanent financing." A copy of this letter was transmitted by the plaintiff to Mr. Friedman, the officer of Bernard, and his attorney on March 8, 1969.
On the evening of April 29, 1969, the outgoing directors of defendant corporation conducted a meeting. The plaintiff was present at such meeting in his capacity as director and as counsel to the corporation. Following this meeting the plaintiff's secretary prepared the minutes of the meeting, which contained the following:
"Discussion was also held on the obligation of the corporation to Patrick J. Fleming in regard to the fees and commissions due him in the amount of $14,500.00 which was to have been paid out of the construction loan, and legal expense involved in the construction loan details, and seeing to it that the permanent loan was picked up. One-half of this fee due upon funding of the construction loan, and one-half of the fee due when the permanent loan was picked up.
After discussion of both these obligations, a motion was made by Neil Gavin, seconded by Frances Schildknecht that these obligations be recognized and made a part of the minutes of this meeting. Motion passed."
The closing of the sale of the corporation was held the following day, April 30, 1969, at the First National Bank in O'Fallon, where the plaintiff was chairman of the board. At the closing the corporate minutes were turned over to the purchasers, together with a "Mutual Release" of all of the outgoing officers and directors. Appended to this "Mutual Release" was the following:
"NOTE: This release does not apply to verbal agreement with *10 Patrick J. Fleming in regard to fees and commissions (see corporation minutes of Parkview Colonial Manor Investment Corporation of April 29, 1969."
Contemporaneously with the closing, the bids submitted for the proposed expansion were opened. Only one bid had been submitted. It was for $817,000. Despite the high bid the purchasers chose to consummate the sale. After closing, the defendant corporation, through its new owner, attempted to have the original commitment by Mr. Poelker and the Firemen's Retirement System assigned to it.
The plaintiff testified that he made several attempts to assist the purchasing parties in obtaining an assignment of the commitment. All efforts at securing approval of an assignment of the commitment failed. Thus the construction loan was not funded and the permanent loan was not "picked up." As a result the construction program contemplated by the former ownership never materialized.
The new management did obtain a new commitment in April 1970. This commitment was for $250,000 for a 41-bed shelter care facility. The new commitment is unrelated to the withdrawn commitment and differs substantially therefrom.
The plaintiff filed a complaint in January 1971, alleging that he had fulfilled his obligations under the "verbal agreement" and that the defendant, therefore, owed him the sum of $14,500. The trial court granted the relief sought and this appeal followed.
Reviewing the foregoing evidence in the light most favorable to the plaintiff we make the following findings. The plaintiff entered into an oral agreement with defendant corporation to obtain the necessary financing for the proposed expansion of its nursing home. This agreement was a unilateral contract. No argument is advanced by either party that the plaintiff was under any obligation to obtain the necessary financing, hence, this could not have been a bilateral contract. The defendant corporation offered to pay the plaintiff a total of $14,500, one-half of this fee was to be paid upon the funding of the construction loan and the remainder to be paid when the permanent loan was "picked up." The plaintiff's acceptance was to be the performance of the above mentioned services, to wit, the attainment of the funding of the construction loan and the attainment of refinancing the permanent loan. At the time the offer was made to the plaintiff, the defendant corporation had not agreed to any conditions concerning what restrictions could be imposed upon such loans by the lender.
 1, 2 The plaintiff obtained a letter of commitment from the comptroller of the city of St. Louis on behalf of the Firemen's Retirement System of St. Louis. Attached to this letter of commitment was the *11 condition that "the operating company cannot be sold nor the agreement be subject to sub-contract without our approval." Consequently, we construe the commitment secured by the plaintiff to be a counteroffer rather than an acceptance since it contained a condition that had not been contained in the offer of defendant corporation. (See Donahoo v. Board of Education, 413 Ill.2d 422, 109 N.E.2d 787; C. Iber & Sons, Inc. v. Grimmett, 108 Ill. App.2d 443, 248 N.E.2d 131.) While the defendant corporation did, through its outgoing directors, "recognize" the obligations to the plaintiff, the record is barren of any action by the defendant corporation which would evidence their agreement to the condition that the corporation not be sold without approval of the prospective lender. Before any agreement can exist there must be an offer (or counteroffer) and an acceptance. (Bank of Marion v. Robert "Chick" Fritz, Inc., 9 Ill. App.3d 102, 291 N.E.2d 836, aff'd, 57 Ill.2d 120, 311 N.E.2d 138.) Thus, without the defendant corporation's agreement to the new condition there would be no acceptance of the plaintiff's counteroffer. See Brook v. Oberlander, 49 Ill. App.2d 312, 199 N.E.2d 613.
 3 Even if we were to assume that the recognition of the corporation's obligation to the plaintiff constituted an agreement to the conditions contained in the letter of commitment, the plaintiff, nevertheless, is entitled to no relief. The plaintiff's efforts secured only a letter of commitment. Except for the plaintiff who testified that he had earned the $14,500 fee by merely securing the commitment, the record contains no evidence indicating that the plaintiff was entitled to his fee before the funding of the construction loan and the "picking up" of the permanent loan. The testimony of Philip Schildknecht, a former director, and the corporate records do little to confirm the plaintiff's contention that the plaintiff's acts entitled him to the payment of the $14,500 fee. Even at the meeting where the board of outgoing directors "recognized" its obligation to the plaintiff the board noted that "One-half of this fee was due upon the funding of the construction loan and one-half of the fee was due when the permanent loan was picked up." The defendant corporation has consistently stated that the plaintiff be paid only after the funding of the construction loan. The construction loan was never funded nor was the permanent loan ever "picked up." Consequently, the plaintiff never tendered the performance contemplated by the parties and which formed the basis of their agreement.
The plaintiff attempts to make an argument that the actions of the defendant corporation prevented the conditions of payment from occurring, thus excusing him from performance. We are unable to understand how, under any reasonable interpretation of the evidence, the defendant corporation's actions can be held to excuse the plaintiff from performance. *12 The only act of the defendant corporation was the sale of its corporate stock. This sale was not precluded by any agreement between the parties. Furthermore, the plaintiff was not only cognizant of this event, but he participated in it and was present when the sale was consummated. The record is devoid of any indication that the plaintiff either disapproved of this sale or that such sale was entered into as a means of preventing the plaintiff from fulfilling the terms of the "verbal agreement." Thus, the sale of the corporate stock of the defendant corporation was, at least, acquiesced in by the plaintiff. Under such circumstances the plaintiff will not now be heard to complain thereof, and he is estopped from asserting that the defendant prevented his compliance.
In view of the foregoing conclusions we hold that the trial court erred in its finding that the plaintiff fulfilled his portion of the "verbal Agreement" and, consequently, in granting the relief sought by the plaintiff. We, therefore, reverse the judgment entered in favor of the plaintiff.
Judgment reversed.
G. MORAN and CARTER, JJ., concur.