**PURINA MILLS, L.L.C., Plaintiff,**

v.

**Kenneth LESS and Karla Less, Defendants.**

**No. C02–4100–MWB.**

United States District Court,
N.D. Iowa,
Western Division.

Dec. 22, 2003.

Becky S. Knutson, Davis, Brown, Koehn, Shors & Roberts, Des Moines, IA, Jona-

than C. Miesen, Lindquist & Vennum, PLLP, Minneapolis, MN, for Plaintiff.

Michael P. Mallaney, Smith, Schneider, Stiles & Serangeli, Des Moines, IA, for Defendant.

## MEMORANDUM OPINION AND ORDER REGARDING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

BENNETT, Chief Judge.

## TABLE OF CONTENTS

I. INTRODUCTION .................................................... 1021
 A. Procedural Background .......................................... 1021
 B. Pertinent Factual Background ................................... 1022

II. STANDARDS FOR SUMMARY JUDGMENT ............................. 1026

III. LEGAL ANALYSIS ............................................... 1027
 A. Choice of Law ................................................ 1027
 B. Liability—Is Purina Mills, L.L.C. A Proper Party In Interest? ............ 1027
 C. Damages .................................................... 1029
 1. Arguments of the parties ................................... 1029
 2. General damage provisions under the U.C.C. ................... 1031
 3. Damages for weanling pigs accepted before the Lesses'
 repudiation ............................................. 1032
 4. Damages for the Lesses' repudiation on August 21, 2002 ........... 1033
 a. When is the contract/market formula under § 2–708(1)
 inadequate? ......................................... 1035
 b. Should Purina be restricted to a lost profits remedy, even
 though the contract/market formula would result in a
 greater damages award? ................................ 1037
 i. Nobs Chemical, U.S.A., Inc. v. Koppers Co., Inc. ............ 1037
 ii. Trans World Metals, Inc. v. Southwire Company ........... 1038
 iii. Union Carbide Corporation v. Consumers Power
 Company .......................................... 1039
 iv. Diversified Energy, Inc. v. Tennessee Valley Authority ...... 1040
 v. Application ......................................... 1042
 c. Application of the lost profits damages formula ................. 1047
 i. Calculation of Purina's lost profits damages ............... 1047
 ii. Prejudgment and postjudgment interest .................. 1048

IV. CONCLUSION ................................................... 1049

## I. INTRODUCTION

### A. Procedural Background

On October 28, 2002, Purina Mills, L.L.C. ("Purina") filed a complaint with this court claiming that defendants Kenneth Less and Karla Less ("Lesses") breached the Producer Pass–Through Agreement ("Agreement") they entered into with Purina. Specifically, Purina alleges that the Lesses breached the agreement by failing to pay for goods they accepted, and by repudiating the remain-

der of the contract. In its complaint Purina requests relief in the form of monetary damages resulting from the repudiation, monies still owing Purina on the goods already accepted, pre-judgment interest, costs and any other equitable relief the court deems appropriate. The defendants timely filed their answer on January 3, 2003, which included an affirmative defense that Purina had failed to state a claim upon which relief could be granted. On June 26, 2003, defendants filed a motion requesting the court to allow them to amend their answer, which was granted by Magistrate Judge Paul A. Zoss, in an order dated July 1, 2003. (Doc. No. 21). On July 1, 2003, the defendants filed an amended answer which asserted the additional affirmative defense that Purina had failed to mitigate its damages. (Doc. No. 22). On July 21, 2003, Purina filed its Motion for Summary Judgment and Request for Oral Argument. (Doc. No. 23). On August 4, 2003, this court granted the defendants' motion for extended time to file their resistance to the plaintiff's motion for summary judgment, and, according to the terms of that order, defendants timely filed their resistance on August 18, 2003. (Doc. No. 27). On August 22, 2003, Purina timely filed its reply to the defendants' resistance. (Doc. No. 29).

Subject matter jurisdiction over Purina's state law contract claim is proper under 28 U.S.C. § 1332—diversity jurisdiction—because the plaintiff is a Delaware corporation with its principle place of business in Delaware, and the defendants are residents of Iowa. Purina avers in its complaint that the amount in controversy exceeds the jurisdictionally required amount of $75,000.00.

The court heard the parties' oral arguments on Purina's motion for summary judgment on October 31, 2003. At these arguments Purina was represented by Jonathan C. Miesen, of Lindquist & Ven-

num, P.L.L.P. in Minneapolis, Minnesota. Defendants Kenneth Less and Karla Less were represented by Michael P. Mallaney of Hudson, Mallaney & Shindler, P.C. in Des Moines, Iowa. A bench trial on this matter is scheduled for January 5, 2004.

### B. Pertinent Factual Background

Purina is a limited liability company engaged primarily in the business of manufacturing and selling animal feed and nutrition products. As an offshoot of its primary business activities, Purina also sells feeder pigs and weanling pigs to its feed customers. Purina's predecessor, Purina Mills, Inc., a corporation, was engaged in the same business ventures. Defendants Kenneth Less and Karla Less operate a large hog farm in Merill, Iowa.

On November 25, 1997, the Lesses and Purina's predecessor, Purina Mills, Inc., entered into a contract titled Producer Pass–Through Agreement ("Agreement"). In the Agreement, Purina Mills, Inc., is referred to as 'Purina,' and the Lesses are referred to as 'Producer.' The objectives of the Agreement are spelled out in the opening paragraph:

WHEREAS, Purina sells feed which is suitable in the industry for the growing of weanling pigs to slaughter weight and wants an assured market for the sale of such feed; and

WHEREAS, Purina has entered into a contract to purchase weanling pigs from a single source for sale to Producer.

WHEREAS, Producer desires to purchase such weanling pigs from Purina for the sole purpose of growing them to slaughter weight.

WHEREAS, Producer desires that Purina purchase the weanling pigs from Perennial Pork, LLP for purpose of sale to Producer. However if weanling pigs are not available from Perennial Pork, LLP, Purina, at is own discretion, will pur-

chase weanling pigs from another single source for sale to Producer.

Plaintiff's Appendix, Doc. No. 23–3 ("Plf.'s App.") at 5. The Agreement provided that the Lesses would purchase approximately 15,000 weanling pigs[1] each year from Purina Mills, Inc., for a period commencing on November 25, 1997, through December 31, 2007. The 15,000 weanling pigs were to be delivered in approximately 28 deliveries over the course of the year.[2] Upon delivery, the weanling pigs were to be graded by the Lesses as either 'grade one,' 'substandard' or 'rejected.' The Lesses were then to regrade the initially graded 'substandard' and 'rejected' weanling pigs approximately 48 hours after delivery. The grading system is described in the Agreement as follows:

> Pigs weighing 8 pounds or more will be classified as grade one. Pigs weighing less than 8 pounds will be classified as substandard. Sick, crippled, damaged or dead pigs not acceptable to Producer are to be classified as rejects and upon regrading shall be destroyed and not counted as party of the quantity delivered to Producer.

Plf.'s App. at 5. If a weanling pig was regraded 'substandard' then the Lesses could elect to either: (1) reject the substandard weanling pig, in which case the Lesses would not have to pay for that pig; or (2) accept the substandard weanling pig and pay a reduced price for that pig. The Agreement requires the Lesses pay $32.00 per 'grade one' weanling pig and $24.00 per weanling pig that is regraded as 'substandard' and that the Lesses elect to accept. If the Lesses chose not to feed the weanlings Purina products, then the price of each accepted weanling pig, whether graded 'grade one' or 'substandard,' would increase by $3.00:

> 15. *FEED AGREEMENT.* Producer acknowledges that Purina's interest in entering into this Agreement is to supply nutritional products and programs.
>
> a. Producer, therefore, agrees to feed nutritional products manufactured and supplied by Purina to all pigs furnished under this Agreement. If Producer fails to feed the pigs Purina products, the price per pig shall be increased by three dollars ($3.00) each. Producer agrees to furnish to Purina all data and other Documentation as Purina deems necessary to complete and verify group closeouts.

Plf.'s App. at 9.

Situations giving rise to a right to terminate the Agreement, the process that must be followed to effectuate a termination, and damages available if termination occurs, are all discussed in paragraph 16 of the Agreement. Paragraph 16(b) gave Purina Mills, Inc., the right to terminate the Agreement if the Lesses failed "to timely pay any material uncontested obligation due and owing to Purina." Plf.'s App. at 10. In order to exercise this right of termination, Purina Mills, Inc., had to comply with specific notice provisions embodied in the Agreement: (1) "Written notice setting forth the alleged breach in detail" must be given to the breaching party; (2) Where the alleged breach is for failure to make payments due, the breaching party must be given 15 days after receipt of the written notice to cure the breach by making full payment. Plf.'s App. at 10. If notice is given pursuant to the enumerated

---

1. The Agreement describes a weanling pig as a pig that is 15 to 21 days of age at the time it is delivered to the Lesses.

2. The Agreement notes that the 15,000 weanling pigs to be sold to the Lesses constituted approximately 55% of the total weanling pigs produced by Perennial Pork, L.L.P.

requirements above, and the breaching party does not cure within the 15–day cure period, then the non-breaching party has "an absolute right to terminate [the] Agreement by giving the other party written notice that [the] Agreement is terminated." Plf.'s App. at 10. If all of these steps are followed, the termination of the Agreement is effective on the day the breaching party receives written notice of the termination. With regard to damages, the Agreement provides:

> In the event this Agreement is terminated by a party pursuant to this Paragraph 16 ... the party may seek to recover from the other party all damages the party has sustained and will sustain in the future as a result of the other party's breach of this Agreement except as further provided for herein.

Plf.'s App. at 11. The only limitation on damages contained in the Agreement is found in Paragraph 16(f), which limits the Lesses to actual damages, and waives their right to incidental or special damages if Purina Mills, Inc. were to breach the agreement.

On November 25, 1997, the same day as the Purina–Less agreement was entered into, Purina Mills, Inc. entered into a contract with Perennial Pork, L.L.P. ("Perennial Pork"). The purposes behind this contract are as follows:

> WHEREAS, [Perennial Pork] is a business committed to the operation of a farrowing facility for the production of consistently uniform, lean, high health status, genetic pigs and market such animals as weanling pigs, as that term is generally used in the swine industry; and
>
> WHEREAS, Purina sells feed which is suitable in the industry for the production of weanling pigs and wants an assured market for the sale of such feed and has therefore established a program where they obtain buyers for weanling pigs of [Perennial Pork] by having the buyer enter into a Producer–Pass–Through Agreement; and
>
> WHEREAS, [Perennial Pork] and Purina desire to enter into an agreement pursuant to which Purina will sell and provide [Perennial Pork] with such feed as is required for the production of such weanling pigs, which pigs [Perennial Pork] will then offer to sell to Purina, and which Purina will buy for resale to other producers to be raised in finishing facilities.

Defendants' Statement of Undisputed Facts in Resistance to Motion for Summary Judgment, Doc. No. 27–2, Exh. B ("Defendants' Undisputed Facts"). This contract provided that Purina would purchase 530 weanling pigs per week[3] from Perennial Pork. The same 'grading' system described in the Purina—Less Agreement was employed in this contract. Purina agreed to pay $32.00 for each 'grade one' weanling pig, and $24.00 for each 'substandard' weanling pig that Purina chose to accept. Under the 'Delivery' section, the contract states: "It is Purina's intent to deliver the pigs to Ken Less' nursery and to the nursery used by Kingsley Producers, L.C. so long as those parties are not in default with Purina." Defendants' Undisputed Facts, Exh. B, ¶ 3. Further, as part of this contract, Perennial Pork was required to purchase from Purina the amount of feed necessary to produce the weanling pigs Purina purchased:

> *FEED PURCHASE.* Producer will purchase from Purina the amount of feed required for producing weanling pigs for sale under this Agreement.

---

**3.** Production of this number of weanling pigs per week requires an inventory of approximately 1,250 sows.

Producer shall retain the right to use its own corn along with Purina concentrates, if it so desires. *It is a material condition for this Agreement* that Producer continue the use of Purina products in the care, feeding and maintenance of all animals related in any manner to this Agreement.

Defendants' Undisputed Facts, Exh. B, ¶ 15 (emphasis added). This contract ran for approximately a ten-year period; from November 25, 1997 through December 31, 2007—the same term as the Purina—Less Agreement.

On October 11, 2001, pursuant to Delaware law, Purina Mills, Inc., converted from a corporation into a limited liability company to become Purina Mills, L.L.C. In this conversion, Purina Mills, L.L.C., allegedly assumed all of the rights and liabilities of Purina Mills, Inc. under the Purina–Less Agreement. There is no written assignment of the Purina–Less Agreement from Purina Mills, Inc. to Purina Mills, L.L.C.

On August 14, 2002, the Lesses accepted delivery of 306 grade one weanling pigs at $32.00 a head, and 4 substandard weanling pigs at $24.00 a head, from Purina Mills, L.L.C., for a total price of $9,888.00. Also on August 14, 2002, the Lesses prepaid their account with Purina by VISA in the amount of $15,000.00. On August 16, 2002, the Lesses accepted delivery of 203 grade one weanling pigs at $32.00 per head, and 2 substandard weanling pigs at $24.00 a head, from Purina Mills, L.L.C. for a total price of $6,544.00. After taking into account the amount the Lesses prepaid by VISA, a balance of $1,432.00 remained. To date, the Lesses have not paid Purina the amount left outstanding on their account.

On August 21, 2002, the Lesses did not accept a scheduled delivery of weanling pigs from Purina because of alleged financial difficulties. The Lesses have not purchased any more weanling pigs from Purina since the last accepted delivery on August 16, 2002.

In a letter dated August 26, 2002, and addressed to the Lesses, Purina's attorney Kevin D. Schluender, references the Agreement, and notes their nonpayment of amounts due and their rejection of additional shipments of weanling pigs. The letter further states that the Lesses' actions constitute a material breach of the Agreement under paragraph 16, and informs them that they must cure the breach within 15 days of receipt of the letter or Purina would exercise its right to terminate the Agreement.

On September 1, 2002, Perennial Pork and Purina Mills, L.L.C., entered into a "Consent to Assignment and Release Agreement" in which Purina consented to Perennial Pork's assignment of the agreement to Concord Valley Pork, L.L.C. ("Concord Pork"), and released Perennial Pork from its obligations under the Purina–Perennial Pork agreement. This assignment was executed in conjunction with Concord Pork's acquisition of all of Perennial Pork's assets, including the Purina–Perennial Pork agreement—thus, the supply contract then became the Purina–Concord Pork Agreement. At this time Concord Pork offered Purina the option of 'buying out' of the supply agreement between the parties for a lump sum price of $100,000.00. Purina refused this offer.

Finally, in a letter dated October 2, 2002, Mr Schluender, on behalf of Purina, again wrote the Lesses. This letter detailed the Lesses' breach of the Agreement, and noted that the Lesses had not taken any action to cure the breach within the 15 days allowed for under the Agreement. The letter concluded as follows:

> Since the cure period has expired, and the breach remains, Purina hereby gives notice that, pursuant to Paragraph 16(d),

it has terminated the Agreement. Purina intends to pursue all of the remedies available to it under Paragraph 16(e). Plf.'s App. at 17. This litigation followed.

## II. STANDARDS FOR SUMMARY JUDGMENT

This court has considered in some detail the standards applicable to motions for summary judgment pursuant to Federal Rule of Civil Procedure 56 in a number of prior decisions. *See, e.g., Swanson v. Van Otterloo,* 993 F.Supp. 1224, 1230–31 (N.D.Iowa 1998); *Dirks v. J.C. Robinson Seed Co.,* 980 F.Supp. 1303, 1305–07 (N.D.Iowa 1997); *Laird v. Stilwill,* 969 F.Supp. 1167, 1172–74 (N.D.Iowa 1997); *Rural Water Sys. # 1 v. City of Sioux Ctr.,* 967 F.Supp. 1483, 1499–1501 (N.D.Iowa 1997), *aff'd in pertinent part,* 202 F.3d 1035 (8th Cir.2000), *cert. denied,* 531 U.S. 820, 121 S.Ct. 61, 148 L.Ed.2d 28 (2000); *Tralon Corp. v. Cedarapids, Inc.,* 966 F.Supp. 812, 817–18 (N.D.Iowa 1997), *aff'd,* 205 F.3d 1347, 2000 WL 84400 (8th Cir. 2000) (Table op.); *Sec. State Bank v. Firstar Bank Milwaukee, N.A.,* 965 F.Supp. 1237, 1239–40 (N.D.Iowa 1997); *Lockhart v. Cedar Rapids Cmty. Sch. Dist.,* 963 F.Supp. 805 (N.D.Iowa 1997). The standard for granting summary judgment is well established. Rule 56 of the Federal Rules of Civil Procedure provides, in pertinent part, as follows:

Rule 56. Summary Judgment

(a) For Claimant. A party seeking to recover upon a claim, counterclaim, or cross-claim or to obtain a declaratory judgement may, at any time after the expiration of 20 days from the commencement of the action or after service of a motion for summary judgment in the party's favor upon all or any part thereof.

(b) For Defending Party. A party against whom a claim ... is asserted ... may, at any time, move for summary judgment in the party's favor as to all or any part thereof.

(c) Motions and Proceedings Thereon.... *The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.*

Fed. R. Civ. P. 56(a)—(c) (emphasis added).

Applying these standards, the trial judge's function at the summary judgment stage of the proceedings is not to weigh the evidence and determine the truth of the matter, but to determine whether there are genuine issues for trial. *Quick v. Donaldson,* 90 F.3d 1372, 1376–77 (8th Cir.1996); *Johnson v. Enron Corp.,* 906 F.2d 1234, 1237 (8th Cir.1990). An issue of material fact is genuine if it has a real basis in the record. *Hartnagel v. Norman,* 953 F.2d 394 (8th Cir.1992) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)). As to whether a factual dispute is "material," the Supreme Court has explained, "Only disputes over facts that might affect the outcome of the suit under governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Rouse v. Benson,* 193 F.3d 936, 939 (8th Cir.1999); *Beyerbach v. Sears,* 49 F.3d 1324, 1326 (8th Cir.1995); *Hartnagel,* 953 F.2d at 394. If a party fails to make a sufficient showing of an essential element of a claim with respect to which the party has the burden of proof, then the opposing party is "entitled to judgment as a matter of law." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *In re Temporomandibular Joint (TMJ) Im-*

*plants Prod. Liab. Litig.,* 113 F.3d 1484, 1492 (8th Cir.1997). In reviewing the record, the court must view all facts in the light most favorable to the nonmoving party and give the party the benefit of all reasonable inferences that can be drawn from the facts. *See Matsushita Elec. Indus. Co.,* 475 U.S. at 587, 106 S.Ct. 1348, 89 L.Ed.2d 538; *Quick,* 90 F.3d at 1377; *Marshall v. UNUM Life Ins. Co.,* 13 F.3d 282, 283 (8th Cir.1994). With these standards in mind, the court turns to consideration of the plaintiff's motion for summary judgment.

## III. LEGAL ANALYSIS

### A. Choice of Law

 Before addressing the merits of the case, the court must first address what state's law applies to the plaintiff's common-law contract claims. In recent years, the court has confronted the problem of what law applies to specific common-law claims in a diversity action. *See Lyons v. Midwest Glazing,* 265 F.Supp.2d 1061, 1071–72 (N.D.Iowa 2003); *Dethmers Mfg. Co., Inc. v. Automatic Equip.,* 23 F.Supp.2d 974, 1001–02 (N.D.Iowa 1998); *Jones Distrib. Co., Inc. v. White Consol. Indus. Inc.,* 943 F.Supp. 1445, 1458 (N.D.Iowa 1996); *Harlan Feeders Inc. v. Grand Labs., Inc.,* 881 F.Supp. 1400, 1403–04 (N.D.Iowa 1995). It is well established that a federal district court sitting in diversity must apply the substantive law of the state in which it sits, including its choice-of-law rules. *Harlan Feeders, Inc.,* 881 F.Supp. at 1403–04 (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 496, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941)); *accord Colonial Ins. Co. of Cal. v. Spirco Envtl., Inc.,* 137 F.3d 560, 561–62 (8th Cir.1998) ("Federal district courts must apply the choice-of-law rules of the state in which they sit when jurisdiction is based on diversity of citizenship." quoting *Whirlpool Corp. v. Ritter,* 929 F.2d 1318, 1320

(8th Cir.1991)). Iowa law employs the Second Restatement's "most significant relationship" test to choice-of-law questions involving contract claims. *See, e.g., Veasley v. CRST Int'l, Inc.,* 553 N.W.2d 896, 897 (Iowa 1996) (recognizing that Iowa has adopted the "most significant relationship" test); *Cameron v. Hardisty,* 407 N.W.2d 595, 597 (Iowa 1987) (same); *Cole v. State Auto. & Cas. Underwriters,* 296 N.W.2d 779, 781–82 (Iowa 1980) (same). The parties do not argue that anything other than Iowa law should apply, and both Purina and the Lesses utilize Iowa statutory law in their briefs. Here, the court finds that Iowa has the most significant relationship to the parties' dispute because the contractual relationship was formed in Iowa, the Lesses reside in Iowa, Purina routinely does business in Iowa, the performance of the contract was in Iowa, and all of the underlying events that spurred this lawsuit occurred in Iowa. *See* RESTATEMENT (SECOND) OF CONFLICTS OF LAWS § 188(2) (absent a contractual choice of law by parties, the court should consider place of contracting, of negotiation, of performance, of contract's subject matter, parties' domiciles, residences, nationalities, places of incorporation, and places of business in determining which state's law to apply).

### B. Liability—Is Purina Mills, L.L.C. A Proper Party In Interest?

 In a settlement statement filed with this court, the Lesses contend that Purina Mills, L.L.C. is not a proper party in interest in this matter. Specifically, the Lesses assert that the Agreement at issue in this case was made between themselves and Purina Mills, Inc., not Purina Mills, L.L.C. The Lesses do not claim that the conversion of Purina Mills, Inc. to Purina Mills, L.L.C. did not occur, but rather they seem to argue that because there was no written assignment of rights under the Agreement from Purina Mills, Inc. to Puri-

na Mills, L.L.C. that Purina Mills, L.L.C. is not entitled to bring an action for breach of the Agreement against the Lesses. Purina rebuts this argument by pointing to Delaware statutory law that provides:

> (f) When any conversion shall have become effective under this section, for all purposes of the laws of the State of Delaware, *all of the rights, privileges and powers of the other entity that has converted,* and all property, real, personal and mixed, and all debts due to such other entity, *as well as all other things and causes of action belonging to such other entity, shall remain vested in the domestic limited liability company to which such other entity has converted* . . . .
>
> (g) Unless otherwise agreed, or as required under applicable non-Delaware law, the converting other entity shall not be required to wind up its affairs or pay its liabilities and distribute its assets, and the conversion shall not be deemed to constitute a dissolution of such other entity and shall constitute a continuation of the existence of the converting other entity in the form of a domestic limited liability company. *When an other entity has been converted to a limited liability company pursuant to this section, the limited liability company shall, for all purposes of the laws of the State of Delaware, be deemed to be the same entity as the converting other entity.*

DEL. CODE ANN. tit. 6, § 18–214(f)–(g) (2003) (emphasis added). In their resistance to Purina's motion for summary judgment, the Lesses do not rebut, or even address, Purina's argument that Purina Mills, L.L.C. obtained the rights, privileges and obligations of Purina Mills, Inc. under the Agreement upon the conversion of Purina Mills from a corporation to a limited liability company.

In addition to Delaware statutory law on the matter, the court notes that Iowa stat-utory law contains almost identical language regarding the rights and obligations of the resulting limited liability company after an effective conversion:

> 6. When a conversion is effective, for all purposes of the laws of this state, all of the rights, privileges, and powers of the converting entity, and all property, real, personal, and mixed, and all debts due to the converting entity, as well as all other things and causes of action belonging to such entity, are vested in the domestic limited liability company and are the property of the domestic limited liability company as they were of the converting entity . . . .

IOWA CODE § 490A.304(6) (2003). Further, the Agreement contains the following provision concerning the assignment of rights under the Agreement:

> *ASSIGNMENT OF RIGHTS.* The rights of each party under this Agreement are personal to that party and may not be assigned or transferred to any other person, firm, corporation or other entity without prior, express and written consent of the other party, *except that Purina shall be entitled to assign its rights and obligations hereunder to any parent, affiliate or subsidiary without Producer's consent without affecting Producer's rights and obligations hereunder.*

Plf.'s App. at 13 (emphasis added). Under the terms of the Agreement, Purina Mills, Inc. was expressly entitled to assign its rights and obligations without impacting the Lesses rights and obligations under the Agreement. Further, from the time of the conversion on October 11, 2001, until the Lesses' repudiation on August 16, 2002, the Lesses accepted, and paid for weaning pigs from Purina Mills, L.L.C., and treated it as if it were a proper party to the Agreement. Only after Purina Mills, L.L.C. filed its complaint did the Lesses voice any concerns regarding Puri-

na's status as a proper party in interest to the Agreement. Even after voicing this concern in a settlement statement, the Lesses did not bother to counter Purina's argument that it was a proper party in interest in their resistence to Purina's motion for summary judgment. The record is sufficient to establish as a matter of law that Purina Mills, L.L.C. is a proper party in interest in this matter, and can properly maintain this action for damages based on breach of the Agreement.

Aside from the proper party in interest argument, the Lesses do not raise any other grounds upon which they would not be liable for breach of the Agreement. As the court has determined that Purina Mills, L.L.C. is a proper party in interest, and there are no other grounds presented upon which the court could find the Lesses not liable for breaching the Agreement, Purina's motion for summary judgment on the question of liability is granted.

### C. Damages

#### 1. Arguments of the parties

The dispute between the parties boils down to a battle over the amount of damages Purina is entitled to for the Lesses' repudiation of the Agreement. In its motion for summary judgment, Purina argues that because weanling pigs are 'goods' as defined by the Uniform Commercial Code ("UCC") the appropriate measure for damages under Iowa Code Chapter 554, Iowa's adoption of the UCC. Specifically, Purina

alleges that as to the weanling pigs that the Lesses already accepted, Purina is entitled to damages for the amount still outstanding on the transaction ($1,432.00) under Iowa Code section 554.2709.[4] As to the Lesses' repudiation, Purina asserts that it is entitled to damages under Iowa Code section 554.2708(1). Section 554.2708(1) provides:

1. *Subject to subsection 2* and to the provisions of this Article with respect to proof of market price (section 554.2723), the measure of damages for nonacceptance or repudiation by the buyer is the *difference between the market price at the time and place for tender and the unpaid contract price* together with any incidental damages provided in this Article (section 554.2710), but less expenses saved in consequence of the buyer's breach.

IOWA CODE § 554.2708 (emphasis added). Purina claims that as an aggrieved seller it is entitled to *select* any remedy available under the UCC, and that section 554.2708 is the "*standard, default* remedy." Plaintiff's Brief in Support of Motion for Summary Judgment (Plaintiff's Brief), Doc. No. 23–1, at pg. 8 (emphasis added). In implementing section 554.2708, Purina asserts a market price of $18.38 per weanling pig, evidenced by the fact that the United States Department of Agriculture ("USDA") quoted the market price of a weanling pig at $18.38 for the week ending August 16, 2001[5]—the reported price al-

---

4. Iowa Code section 554.2709 provides in pertinent part:
 When the buyer fails to pay the price as it becomes due the seller may recover, together with any incidental damage under the next section, the price ... of goods accepted ....
 IOWA CODE § 554.2709(1)(a) (2003).

5. Section 554.2723, entitled "Proof of market price—time and place," provides:
 1. If an action based on anticipatory repudiation comes to trial before the time for

performance with respect to some or all of the goods, any damages based on market price (section 554.2708 or 554.2713) shall be determined according to the price of such goods prevailing *at the time when the aggrieved party learned of the repudiation.* 2. If evidence of a price prevailing at the times or places described in this Article is not readily available the price prevailing *within any reasonable time before or after the time described* ... may be used ....
IOWA CODE § 554.2723 (emphasis added).

legedly closest in time to when Purina learned of the Lesses' repudiation on or about August 21, 2001. A contract price of $35.00,[6] minus the asserted market price of $18.38 yields a difference of $16.62. This difference of $16.62 times 76,250—the number of weanling pigs that Purina alleges the Lesses were to purchase under the remaining term of the agreement—equals $1,267,275.00. As Purina claims to not have saved any expenses as a result of the Lesses' repudiation, Purina claims that it should recover damages of $1,432.00 under section 554.2709, plus $1,267,275.00 under section 554.2708, for a grand total of $1,268,707.00.

In their resistence, the Lesses do not dispute the damages Purina claims under 554.2709. Rather, the Lesses argue that based on the UCC mantra, embodied in Iowa code section 554.1106, that the aggrieved seller is not entitled to a windfall, use of section 554.2708(1) to calculate damages due to the Lesses repudiation overcompensates Purina. The Lesses assert that, to date, Purina has resold all of the weanling pigs that the Lesses were to have purchased at prices in excess of the USDA market rate, and in some instances at prices in excess of the $35.00 per pig the Lesses were to have paid under the Agreement. The Lesses appear to argue that use of section 554.2708(1) to calculate Purina's damages for the Lesses' repudiation amounts to a 'failure to mitigate damages' on Purina's part. Therefore, to avoid overcompensation the Lesses assert that Purina's damages must be calculated using section 554.2708(2) (lost profits). According to section 554.2708(2):

> 2. If the measure of damages provided in subsection 1 is inadequate to put the seller in as good a position as performance would have done then the measure

of damages is the profit (including reasonable overhead) which the seller would have made from performance by the buyer, together with any incidental damages provided in this Article (section 554.2710), due allowance for costs reasonably incurred and due credit for payments or proceeds of resale.

IOWA CODE § 554.2708(2). The Lesses assert that had they performed, Purina's profit would be only $3.00 per weanling pig. Therefore, using section 554.2708(2), Purina is not entitled to the nearly $1.3 million dollars in damages that it is claiming. Further, even if section 554.2708(1) is the appropriate measure of damages, the Lesses argue that the market price used by Purina is not appropriate. The Lesses argue that due to the length of the contract term that the USDA market price is not the applicable market price to apply to the remainder of the Agreement, but that the correct market price under this formula is the market price at each specific time the Lesses would have been required to perform under the Agreement. Stated another way, the Lesses claim that the USDA market price for the week ending August 16, 2002 is not the appropriate market price to apply to determine Purina's recovery under the contract/market differential, but that the applicable market price is the USDA market price at the time that the Lesses' performance would become due under the Agreement (i.e. the market price is different for each week the Lesses would have received a shipment). Additionally, the Lesses contend that Purina's damage calculation doesn't deduct the expenses Purina saved on those weanling pigs that may have been graded 'substandard' and rejected. Finally, the Lesses

---

**6.** This number is arrived at by taking the contract price for each weanling pig, $32.00, plus the additional $3.00 per weanling pig the Lesses would have to pay for failing to feed the weanling pigs Purina feed products.

claim that any damages awarded should be discounted to present value.

Purina's reply asserts that the Lesses' resistance fails to take into account the fact that Purina entered into an agreement with Perennial Pork, under which Purina agreed to purchase from Perennial Pork the weanling pigs it was to sell to the Lesses for the entire term of the Agreement. To date, Purina claims that it has sustained $75,413.08 in losses from reselling the weanling pigs that were to be purchased by the Lesses. Further, Purina claims that there is no way to predict how much money Purina will lose in trying to resell the weanling pigs the Lesses were to have purchased over the next four and a half years. Moreover, Purina argues that the Lesses cannot restrict it to a lost-profits remedy because, by its language, section 554.2708(2) can only be used where section 554.2708(1) is *inadequate* to put the seller in as good of a position as performance would have. Because there is no evidence that damages under section 554.2708(1) are inadequate in this instance, lost profits damages under section 554.2708(2) are unavailable. Purina counters the Lesses' assertion that the USDA market price for the week of August 16, 2002 is not the appropriate market price to apply to the entire remainder of the Agreement by pointing to section 554.2723, *supra* footnote 4, which provides that in a case of repudiation where the action is brought before the time of performance has passed, the market price is determined by the price of the goods at the time the seller "learned of the repudiation." Iowa Code § 554.2723(1). Therefore, since Purina learned of the repudiation on August 21, 2002, the market price on August 16, 2002 ($18.38)—the date closest in time to the repudiation—is applicable. Finally, Purina claims that its failure to account for substandard or rejected pigs does not preclude summary judgment. Historically, looking at all of the shipments to the Less-es before their repudiation, the maximum percentage of the pigs graded 'substandard' or rejected in any one shipment to the Lesses was 3.7%. Therefore, reducing the number of weanling pigs to be purchased under the remainder of the contract, 76,-250, by 3.7% yields 73,429 weanling pigs. Multiplying 73,429 by the contract/market differential of $16.62 would yield damages in the amount of $1,220,398.98. Purina states that it would accept this lesser amount in order to dispose of the matter at this point in the litigation. Finally, Purina concludes its reply with a perfunctory assertion that any damages award to Purina should not be discounted to present value.

### 2. General damage provisions under the U.C.C.

■ Iowa has adopted the Uniform Commercial Code ("UCC") in chapter 554 of the Iowa Code. The Iowa Uniform Commercial Code applies only to transactions in 'goods':

> "*Goods*" means all things (including specially manufactured goods) which are movable at the time of identification to the contract for sale.... "Goods" also includes the unborn young of animals and growing crops....

Iowa Code § 554.2105(1). As the subject matter of the Agreement, weanling pigs, falls within this definition of 'goods,' the Iowa Uniform Commercial Code applies to the Agreement. Further, the court notes that in interpreting the Iowa Uniform Commercial Code, the Iowa Supreme Court has looked both to cases in other jurisdictions that have adopted the Uniform Commercial Code and treatises on the Uniform Commercial Code, as authoritative in determining how the Iowa Uniform Commercial Code should be interpreted. *See, e.g., Data Documents, Inc. v. Pottawattamie County,* 604 N.W.2d 611,

615–17 (Iowa 2000) (relying on case law from other jurisdictions adopting the same UCC provisions in determining the requirements for damages under sections 554.2708 and 554.2709). As the Iowa Supreme Court finds case law from other jurisdictions instructive in interpreting the Iowa Uniform Commercial Code, so too does this court in this matter. As the Iowa Uniform Commercial Code mirrors the UCC, the court shall henceforth refer to them interchangeably.

Section 2–703 of the UCC sets forth a catalog of the remedies the seller may pursue when the buyer wrongfully rejects goods, fails to make payment, or repudiates the contract. *See* IOWA CODE § 554.2703.[7] The UCC rejects Purina's claim to a right to select the remedy of its choosing in Comment 1 to § 2–703:

> This section is an index section which gathers together in one convenient place all of the various remedies open to a seller for any breach by the buyer. *This Article rejects any doctrine of election of remedy as a fundamental policy and thus the remedies are essentially cumulative in nature and include all of the available remedies for breach.* Whether the pursuit of one remedy bars another depends entirely on the facts of the individual case.

UNIFORM COMMERCIAL CODE § 2–703, Comment 1 (emphasis added); *see also Sprague v. Sumitomo Forestry Co., Ltd.,* 104 Wash.2d 751, 709 P.2d 1200, 1204 (Wash.1985) ("The pertinent commentary thereto indicates specifically that the remedies provided are cumulative and not exclusive and that as a fundamental policy Article 2 of the U.C.C. rejects any doctrine of election of remedy."). In determining the appropriate remedy, the court must be mindful of the UCC's basic philosophy that "the *aggrieved party may be put in as good a position as if the other party had fully performed* but neither consequential or special nor penal damages may be had except as specifically provided in this chapter or by other rule of law." IOWA CODE § 554.1106. This sentiment is echoed in Iowa case law. *See, e.g., Midland Mut. Life Ins. Co. v. Mercy Clinics, Inc.,* 579 N.W.2d 823, 831 (Iowa 1998) (stating that in a breach of contract situation the non-breaching party is entitled to be placed in "as good a position as he or she would have occupied had the contract been performed," but is "not entitled to be placed in better position than he would have been in if the contract had not been broken.") (citations omitted). The Eighth Circuit has read section 1–106 to require the court to "look through the form of a transaction to its substance when necessary to fulfill the parties' expectations expressed in the contract." *H–W–H Cattle Co., Inc. v. Schroeder,* 767 F.2d 437, 440 (8th Cir. 1985).

### 3. Damages for weanling pigs accepted before the Lesses' repudiation

 Purina claims it is entitled to the outstanding amount on the Lesses account

---

7. Iowa Code section 554.2703 provides:
 Where the buyer wrongfully rejects or revokes acceptance of goods or fails to make a payment due on or before delivery or repudiates with respect to a part or the whole, then with respect to any goods directly affected and, if the breach is of the whole contract (section 554.2612), then also with respect to the whole undelivered balance, the aggrieved seller may
 a. withhold the delivery of goods
 b. stop delivery by any bailee as hereafter provided (section 554.2705)
 c. proceed under the next section respecting goods still unidentified to the contract;
 d. resell and recover damages as hereafter provided (section 554.2706)
 e. recover damages for nonacceptance (section 554.2708) or in a proper case the price (section 554.2709)
 f. cancel.
 IOWA CODE § 554.2703.

pursuant to the following language of section 2–709:

> (1) When the buyer fails to pay the price as it becomes due the seller may recover, together with any incidental damages under the next section, the price (a) of goods accepted. . . .

IOWA CODE § 554.2709(1)(a). An action for price under section 2–709 is tantamount to an action for specific performance. *Karen v. Cane*, 152 Misc.2d 639, 578 N.Y.S.2d 85 (N.Y.Civ.Ct.1991); 24 WILLISTON ON CONTRACTS § 66:21 (Richard A. Lord, 4th ed.). In order to recover the price of the goods under section 2–709, the plaintiff-seller must show: (1) it performed according to the terms of the contract; (2) the goods were accepted by the buyer; (3) the price of the goods accepted; (4) that the due date for payment has past; and (5) that the buyer has failed to pay. 24 WILLISTON ON CONTRACTS § 66:21. Purina asserts that it has met all of these requirements. Purina's claims are borne out by the record. On August 14, 2002 and August 16, 2002, the Lesses accepted weanling pigs from Purina at a total price of $16,432.00. The Lesses paid $15,000.00 towards this amount, and retained ownership of all of the weanling pigs from those two deliveries. The Lesses have not made any attempt to return the weanling pigs, nor have they claimed that the weanling pigs delivered were defective or didn't meet the contractual warranties. In their resistance, the Lesses did not make any attempt to counter Purina's claimed entitlement to the outstanding price of the weanling pigs delivered. *Compare Carlisle Corp. v. Uresco Constr. Materials, Inc.*, 823 F.Supp. 271, 273 (M.D.Pa.1993) (finding seller entitled to price under section 2–709 where "there [was] no question that the goods were accepted and that the buyer [failed] to pay the price as it became due) *with Hayes v. Hettinga*, 228 N.W.2d 181, (Iowa 1975) (determining plaintiff not entitled to price remedy under section

554.2709 where plaintiff was unable to establish that defendant accepted the goods)" *and Karen v. Cane*, 152 Misc.2d at 642, 578 N.Y.S.2d 85 ("A seller may not recover the purchase price of goods where factual questions have been raised regarding the seller's performance under the contract."). As a matter of law, Purina is entitled to the $1,432.00 outstanding on the weanling pigs delivered to the Lesses on August 14, 2002 and August 16, 2002. *See also* Roy Ryden Anderson, *A Roadmap for Seller's Damage Remedies Under the Uniform Commercial Code and Some Thoughts about Pleading and Proving Special Damages*, 19 RUTGERS L.J. 245, 251 (1988) ("If the buyer has accepted the goods and cannot throw them back on the seller, the seller is entitled as a matter of course to the full unpaid contract price under section 2–709.").

### 4. Damages for the Lesses' repudiation on August 21, 2002

■ What at first glance, in determining which provision applies, appears to be a dispute easily resolved through a banausic application of the UCC damages provisions, becomes a delicate balancing of the wording of the UCC provisions, the principles underlying the UCC provisions, and the molding of UCC provisions to a fact scenario unanticipated by the drafters of the UCC.

The debate over the amount of damages Purina is entitled to due to the Lesses' repudiation centers around section 2–708 of the UCC:

> 1. Subject to subsection 2 and to the provisions of this Article with respect to proof of market price [ ], the measure of damages for nonacceptance or repudiation by the buyer is the difference between the market price at the time and place for tender and the unpaid contract price together with incidental damages provided in this Article, but less ex-

penses saved in consequence of the buyer's breach.

2. If the measure of damages provided in subsection 1 is inadequate to put the seller in as good a position as performance would have done then the measure of damages is the profit (including reasonable overhead) which the seller would have made from full performance by the buyer, together with any incidental damages provided in this Article, due allowance for costs reasonably incurred and due credit for payments or proceeds of resale.

Iowa Code § 554.2708 (2003). As previously noted, Purina claims that it is entitled to damages under subsection (1); the difference between the contract price and the market price ("contract/market") at the time that Purina learned of the Lesses' repudiation. Multiplying the difference between the contract price, $35.00,[8] and the market price, $18.38,[9] by the number of weanling pigs the Lesses were to buy under the remainder of the contract, 76,-250,[10] the court arrives at a damages award, under this measure of damages, of $1,267,275.00.[11] The Lesses claim that using the contract/market formula would result in a windfall to Purina, and that Purina should instead be restricted to the "lost profits" remedy under subsection (2) of

section 2–708. Purina responds to the Lesses' attempt to restrict it to lost profits by pointing out the contract/market formula *adequately* compensates Purina, and that the statute expressly states that the lost profits formula is not available unless the contract/market formula is *inadequate* to compensate the seller.

■ Generally, the seller is *not* restricted to any particular formula, and is awarded the damages they would have received under the contract/market formula as long as the seller has adequately established the market price and the unpaid contract price. *See Data Documents, Inc.,* 604 N.W.2d at 616 (holding plaintiff-seller not entitled to damages under § 2–708(1) or (2) where plaintiff failed to present sufficient evidence "concerning market price, lost profits, and costs saved in consequence of the buyer's breach"); *Karen,* 578 N.Y.S.2d at 88 ("While repudiation of a sales contract would normally result in recovery of damages, the plaintiff failed to establish damages in accordance with section 2–708(1) of the U.C.C., in that, the plaintiff did not offer any evidence establishing the difference between the market price and the unpaid contract price"); *Madsen v. Murrey & Sons Co., Inc.,* 743 P.2d 1212, 1216 (Utah 1987) (holding that where a market existed for the goods that

8. This contract price represents the $32.00 price per weanling pig in the Agreement plus the $3.00 per weanling pig the Lesses would have to pay for not feeding the pigs Purina feed products.

9. This figure represents the market price for a "10 lb weighted average" weanling pig as reported by the USDA for the week of August 16, 2002. Defendant's App., Doc. No. 23 at 19. In addition to which formula should be used to assess Purina's damages, the parties also disagree as to whether this is the appropriate market price to be used in the calculation of damages under section 2–708(1). This matter of contention is addressed, *infra,* part III.C.4.c.i.

10. In its reply brief Purina, in response to the Lesses' argument that the 76,250 figure fails to take into account the percentage of weanling pigs that may be rejected or graded substandard, concedes that to account for the potential substandard/reject pigs it will drop this number to 73,429 by reducing 76,250 by the maximum percentage of substandard and reject weanling pigs delivered to the Lesses under the Agreement in any one shipment, or 3.7%.

11. Using the 73,429 figure for the number of weanling pigs remaining under the agreement, the "contract/market" damages award under Purina's asserted contract and market prices, would be $1,220,389.98.

were the subject matter of the contract, the "seller's damages must be determined under section [2–708(1) ].". In fact, courts in most instances reject the application of the lost profits formula unless there is a showing that the contract/market formula results in an inadequate, or lesser, recovery for the seller. *See, e.g., Tigg v. Dow Corning Corp.*, 962 F.2d 1119, 1129 (3d Cir.1992) (finding that district court could instruct on lost profits formula for calculating damages "only if contract/market damages were first found to be inadequate"); *Bill's Coal Co., Inc. v. Bd. of Public Utilities of Springfield, Mo.*, 887 F.2d 242, 245 (10th Cir.1989) ("Sellers fall into section 2–708(2) only if they can demonstrate that they would receive inadequate damages under 2–708(1)"); *Trans World Metals, Inc. v. Southwire Co.*, 769 F.2d 902, (2d Cir.1985) ("nothing in the language or history of section 2–708(2) suggests that it was intended to apply to cases in which section 2–708(1) might overcompensate the seller"); *In re S.N.A. Nut Co.*, 247 B.R. 7, 19 (N.D.Ill.2000) ("The seller may not receive lost profits unless it has demonstrated that the market price remedy provided in § 2–708(1) would be inadequate.").

### a. When is the contract/market formula under § 2–708(1) inadequate?

Courts have routinely recognized that the contract/market remedy is inadequate, and that the lost profits formula is applicable, in three situations. First, where the goods to be sold, and that are the subject of the breached or repudiated contract, are specially-manufactured goods for which there is no readily accessible market. *See, e.g., Tigg Corp. v. Dow Corning Co.*, 962 F.2d at 1129; *Alter & Sons Inc. v. United Eng'rs and Constructors, Inc.*, 366 F.Supp. 959, 966 (S.D.Ill. 1973); *Madsen*, 743 P.2d at 1216; *Bead Chain Mfg. Co. v. Saxton Prods., Inc.*, 183

Conn. 266, 439 A.2d 314, 320 (1981); *Timber Access Indus. Co. v. U.S. Plywood–Champion Papers, Inc.*, 263 Or. 509, 503 P.2d 482, 489–90 (1972); *Anchorage Centennial Dev. Co. v. Van Wormer & Rodrigues, Inc.*, 443 P.2d 596, 599 (Alaska 1968).

The second situation is where the seller is a "lost volume seller," which is defined as:

> "... one who upon a buyers breach of contract, resells the article to a second purchaser at the price agreed to by the first purchaser. The second purchaser, however, would have purchased a similar article notwithstanding the first purchaser's breach. Under such circumstances, when the seller resells the article, he is still not made whole because he will have lost one sale, one profit, over the course of the year."

*Tigg Corp.*, 962 F.2d at 1130 (quoting *Storage Tech. Corp. v. The Trust Co. of N.J.*, 842 F.2d 54, 56 n. 2 (3rd Cir.1988)) (quotations omitted): *see also Unique Designs, Inc. v. Pittard Mach. Comp.*, 200 Ga.App. 647, 409 S.E.2d 241, 243 (1991) ("lost volume seller[ ] refers to a seller who due to the nature of its business, is damaged by a buyer's breach to the extent that it loses the entire profit from the sale."). A lost volume seller is not adequately compensated by the contract/market formula because it would result in damages less than the profit the seller expected to make from both sales; he would be reimbursed only for one profit, rather than the two profits he would have earned if there had been no breach. *See Bill's Coal Co., Inc.*, 887 F.2d at 245 ("A lost volume seller is one who has the capacity to perform the contract which was breached as well as other potential contracts, due to their unlimited resources or production capacity."); *Snyder v. Herbert Greenbaum and Assocs., Inc.*, 38 Md.App. 144, 380 A.2d 618, 624 (1977); *Trienco, Inc. v. Applied Theory, Inc.*, 102

Or.App. 362, 794 P.2d 1239, 1241 n. 1 (1990) ("A lost volume seller is entitled to recover lost profits ... because damages measured by the difference between the market price and the contract price will not place the seller in as good a position as would performance of the contract."); 1 JAMES J. WHITE & ROBERT S. SUMMERS, UNIFORM COMMERCIAL CODE § 7–9 (4th ed.1995)(hereinafter "WHITE & SUMMERS"). Also, where the plaintiff-seller has proved that he is entitled to "lost volume" status, not only does the "lost profit" formula apply to calculate his damages, but the "due credit provision" of § 2–708(2), which requires the proceeds of any resale be credited against the damage award, does not apply. *Snyder*, 380 A.2d at 624; *Unique Designs, Inc.*, 409 S.E.2d at 244.

The third, and final, category of sellers recognized as *inadequately* compensated under the contract/market formula are sellers who are "jobbers." According to the Eighth Circuit Court of Appeals, to be classified as a "jobber" a seller must: (1) never acquire the contract goods; and (2) his decision not to acquire the goods after learning of the breach must be commercially reasonable. *Blair Intn'l, Ltd. v. La-Barge, Inc.*, 675 F.2d 954, 960 (8th Cir. 1982); *see also Nobs Chemical, U.S.A., Inc. v. Koppers Co., Inc.*, 616 F.2d 212, 215 (5th Cir.1980) (defining a "jobber" under the same two factors); *Mid–South Materials Co. v. Ellis*, No. 87–314–II, 1988 WL 23914, at *2 (Tenn.Ct.App. Mar.16, 1988) (citing *Blair* for requirements for classification as a "jobber"); *Copymate Mktg., Ltd. v. Modern Merch., Inc.*, 34 Wash.App. 300, 660 P.2d 332, 333 (1983) (finding lost profits remedy applicable where seller never obtained possession of the goods, and cancellation of purchase contract whereby seller would have obtained the goods was commercially reasonable); 67A AM. JUR. 2D *Sales* § 1008 (listing same requirements for classification as a "jobber," and referencing *Blair* ).

[Where the seller meets the criteria of being classified as a jobber] the seller's actions for the price or resale are inapplicable. And a recovery of damages under 2–708(1) will place [the seller] in the same position as performance only by chance. Since the jobber has no goods on hand to resell, seller cannot even resell on the market at the time of tender and so recoup the amount necessary to make it whole by adding such proceeds to its 2–708(1) recovery. Thus the only recovery which grossly approximates the "jobber's" economic loss is a recovery based on lost profits.

WHITE & SUMMERS, § 7–10, pg. 389.

By listing the three categories of sellers that are routinely granted a lost profits remedy under § 2–708 the court is in no way asserting that these are the only types of sellers entitled to the lost profits remedy. The lost profits remedy is in no way restricted to these three categories, these are just the three categories of sellers that are most widely recognized as inadequately compensated by the contract/market remedy—hence, making lost profits damages the appropriate remedy. *Accord* WHITE & SUMMERS, § 7–11, pg. 389 (recognizing that § 2–708(2) "covers a multitude of plaintiffs who are neither lost volume sellers, nor jobbers, nor component sellers."). Importantly, the court notes that Purina does not comfortably fit within any of these three categories of sellers. It cannot qualify as a "jobber" as it has acquired, and is contractually obligated to acquire, the weanling pigs it was to sell to the Lesses from Perennial Pork. Purina also does not fit into the "lost volume" seller category as it would not have been able to sell the weanling pigs it was supposed to sell to the Lesses to a third party regardless of the Lesses' repudiation of the contract. Finally, and quite obviously, weanling pigs are not specialty goods for

which there is no easily identifiable market.

### b. Should Purina be restricted to a lost profits remedy, even though the contract/market formula would result in a greater damages award?

In spite of the wording of section 2–708 making the lost profits formula available only in the cases where the contract/market formula is inadequate, courts have, in three instances, found factual circumstances that warrant restricting an aggrieved seller to lost profits damages. This court finds these rare cases particularly instructive in determining the appropriate damages formula to apply to this matter, and as such concludes it necessary to provide recaps of the four cases dealing specifically with the question before the court in this matter: should Purina be forced to take damages under a lost profits formula, even where the contract/market formula would yield a greater damages award?

### i. Nobs Chemical, U.S.A., Inc. v. Koppers Co., Inc.

In *Nobs Chemical, U.S.A., Inc. v. Koppers Co., Inc.*, 616 F.2d 212 (5th Cir.1980), the Fifth Circuit Court of Appeals became the first court to publicly address whether a seller's damages for breach of contract by the buyer should be calculated under the lost profits formula or the "market/contract" formula. In this case, Koppers Company ("Koppers") contracted with Nobs Chemical, U.S.A., Inc. ("Nobs Chemcial") and Calmon–Hill Trading Corporation ("Calmon–Hill") to purchase 1000 metric tons of cumene.[12] *Id.* at 214. Koppers breached the contract. Nobs Chemical and Calmon–Hill had made arrangements to purchase the cumene from a Brazilian supplier for a fixed price, but at the time of the breach Nobs Chemical was *not* contractually bound to purchase the cumene. *Id.* The district court found that Nobs Chemical was entitled only to its lost profits, or $95,000.00. Nobs Chemical appealed this decision to the Fifth Circuit Court of Appeals, asserting that it was entitled to the contract/market formula for calculating its damages. *Id.* Under the contract/market formula, Nobs would have received approximately $300,000, or three times more than it would under the lost profits formula. *See id.*

The court first noted that Nobs Chemical and Calmon–Hell met both of the requirements for categorization as "jobbers" as they had never acquired the contract goods, and the decision not to acquire the contract goods was commercially reasonable. *Id.* at 215. Then, drawing heavily on the White & Summers treatise on the UCC as no other jurisdiction had directly addressed the issue, the court ultimately restricted Nobs Chemical and Calmon–Hill to lost profits damages under § 2–708(2):

> (a) as a liquidated damage clause available to a plaintiff-seller regardless of his actual damages. There have been some commentators who agree with this philosophy.... White and Summers conclude that statutory damage formulas do not significantly affect the practices of businessmen and therefore "breach deterrence," which would be the purpose of the statutory liquidated damages clause, should be rejected in favor of a standard approximating actual economic loss. WHITE & SUMMERS, *supra,* § 7–12, at 232. No one insists, and we do not think they could, that the difference between the fallen market price and the contract price is necessary to

12. Cumene is a colorless, oily, hydrocarbon used as an additive for high-octane gasoline.

*Nobs Chemical,* 616 F.2d at 214 n. 1.

compensate the plaintiffs for the breach. Had the transaction been completed, their "benefit of the bargain" would not have been affected by the fall in market price, and they would not have experienced the windfall they otherwise would receive if the market price-contract price rule contained in § 2.708(a) is followed. Thus the premise contained in § 1.106 and Texas case law is a strong factor weighing against application of § 2.708(a).

*Id.* at 215–16. The court affirmed the district court's use of the lost profits formula to calculate Nobs Chemical's and Calmon–Hill's damages for Kopper's breach of contract.

### ii. Trans World Metals, Inc. v. Southwire Company.

Though the case of *Trans World Metals, Inc. v. Southwire Company,* 769 F.2d 902 (2d Cir.1985), illustrates a case in which the court *refused* to force the plaintiff-seller to take damages under the lost profits formula where the seller had proved the necessary elements for obtaining contract/market damages, *Id.* at 907–09, it is valuable in that it helps illuminate factual situations in which it is inappropriate to force the seller to take lost profit damages. In *Trans World,* the plaintiffs Trans World Metals, Inc., Trans–World Metals & Co., Ltd. and Trans World Metals, Ltd. (collectively "Trans World") entered into a contract with Southwire Company ("Southwire") in March 1981, in which Trans World was to deliver 2,205,000 pounds of aluminum monthly, from January 1982 through December 1982. *Id.* at 904. In exchange, Southwire would pay Trans World approximately $0.77 per pound. *Id.* In March 1982, the price of aluminum fell dramatically and Southwire repudiated the contract in its entirety. *Id.* at 905. In May 1982, Trans World filed suit against Southwire for breach of contract in New York State court. *Id.* The jury awarded Trans World $6,702,529.00 for the repudiation,

using the contract/market formula, and $419,232.84 for shipments that were accepted by Southwire, but never paid for. *Id.* at 906. The district court denied Southwire's motions for judgment notwithstanding the verdict and for a new trial, and an appeal to the Second Circuit Court of Appeals followed. *Id.*

On appeal, Southwire raised numerous points of contention, but in regard to the formula used to calculate Trans World's damages, Southwire relied on *Nobs Chemical* and argued that the lost profits formula should be used as the contract/market formula would overcompensate Trans World. The Second Circuit Court of Appeals outright rejected Southwire's contentions for the following reasons:

> . . . nothing in the language or history of section 2–708(2) suggests that it was intended to apply to cases in which section 2–708(1) might overcompensate the seller. *See* WHITE & SUMMERS § 7–12, at 283. Nor has Southwire cited any New York case that interprets section 2–708(2) as Southwire urges us to interpret it. As a federal court sitting in diversity, we will not extend the application of this state law.
>
> Nor are we convinced that Trans World has been overcompensated. No measure other than the contract/market price differential will award Trans World the "benefit of its bargain," that is, the "amount necessary to put [it] in as good a position as [it] would have been if the defendant had abided by the contract." *Western Geophysical Co. of America, Inc. v. Bolt Associates, Inc.,* 584 F.2d 1164, 1172 (2d Cir.1978) (quoting *Perma Research & Development Co. v. Singer Co.,* 402 F.Supp. 881, 898 (S.D.N.Y.1975), *aff'd,* 542 F.2d 111 (2d Cir.), *cert. denied,* 429 U.S. 987, 97 S.Ct. 507, 50 L.Ed.2d 598 (1976)). The contract at issue in this case is an aluminum

supply contract entered into eight months prior to the initial deliveries called for by its terms. The last of the anticipated deliveries of aluminum would not have been completed until a full twenty months after the negotiations took place. *It simply could not have escaped these parties that they were betting on which way aluminum prices would move. Trans World took the risk that the price would fall. Under these circumstances, Trans World should not be denied the benefit of its bargain, as reflected by the contract/market price differential. Cf. Apex Oil Co. v. Vanguard Oil & Service Co.,* 760 F.2d 417 (2d Cir.1985) (defaulting seller obligated to pay damages based on contract/market price differential).

*Id.* at 908 (emphasis added and footnotes omitted). The court differentiated the *Nobs Chemical* case by noting that in *Nobs Chemical* the plaintiff-sellers had contractually insulated themselves against market price fluctuation by entering into a second fixed-price contract with their Brazilian supplier. The result of this second contract was that the plaintiffs contractually fixed their 'market price.' *Id.* In this case, unlike *Nobs Chemical,* Trans World did *not* enter into any adjacent contracts to fix their market price, and therefore since "Trans World accepted the risk that the prices would rise, it is entitled to benefit from their fall" through an award under the contract/market formula. *Id.* at 909.

### iii. Union Carbide Corporation v. Consumers Power Company.

The case of *Union Carbide Corporation v. Consumers Power Company,* 636 F.Supp. 1498 (E.D.Mich.1986), involved two contracts: (1) A contract between Petrosar Limited and Union Carbide in which Union Carbide was to acquire residual fuel oil from Petrosar Limited; and (2) a contract between Union Carbide and Consumers Power Company in which Consumers would purchase 10,000 barrels of residual fuel oil a day from September 5, 1980 through December 31, 1987. *Id.* at 1499. The execution of these two simultaneous contracts resulted in the "Consumer [Power Company] always pa[ying] Union Carbide more per barrel than Union Carbide paid to Petrosar [Limited]." *Id.* at 1500. Following a dramatic drop in the price of residual fuel oil, Consumers Power Company refused to accept any more deliveries of fuel oil from Union Carbide after December 31, 1981. *Id.* Union Carbide cancelled the contract with Consumers Power Company, and paid Petrosar Limited, pursuant to a clause in the Union Carbide–Petrosar Limited contract, to keep the oil that Petrosar was to deliver to Union Carbide. *Id.* Union Carbide sued Consumers Power Company for breach of contract, alleging that it was entitled to damages under the contract/market formula. *Id.* at 1501. Consumers Power Company asserted that Union Carbide should be restricted to the lost profits formula for calculating damages, as awarding damages under the contract/market formula would result in Union Carbide receiving *more* than it would have received had the contract been performed. *Id.* In this case the lost profits damages amounted to $30 million, while the contract/market damages came to around $120 million. *Id.* at 1503.

The court first defined 'inadequate' in the following manner in order to give it meaning both where the contract/market formula undercompensates and overcompensates the aggrieved seller:

> ... the court believes that inadequate should be interpreted to mean incapable or inadequate to accomplish the stated purpose of the UCC remedies of compensating the aggrieved person but not overcompensating that person or specially punishing the other person. The measure of damages provided in section 1 will be incapable of putting the seller in as good a position as performance

whenever it does not fairly measure the damages suffered by the aggrieved party. This interpretation is more flexible in that it provides the damages under section 1 can be *too great or too small.* *Id.* at 1501 (emphasis added). As the facts of *Union Carbide* were analogous to those presented in *Nobs Chemical,* the court derived support for its position from the *Nobs Chemical* holding. *Id.* at 1501–02. The court noted that for the period of time that Union Carbide sought damages, it was acting as a "jobber" in that it did not acquire the residual fuel oil after Consumers Power Company repudiated the contract, and that the decision not to acquire any more fuel oil was commercially reasonable. *Id.* at 1503. The court adopted the rationale proffered in Nobs that use of the contract/market formula, where it would clearly overcompensate the plaintiff-seller, flies in the face of the UCC's philosophy embodied in § 1–106(1) that the aggrieved party should be placed in "as good as" a position as performance would have done, but no better. *Id.* The court concludes that it should restrict Union Carbide to lost profits damages under § 2–708(2) because it did not assume the risks of a market fluctuation in the price of oil, and because the contract/market formula would overcompensate it:

> Most importantly, this court finds that here, as in *Nobs Chemical,* had the transaction between Union Carbide and Consumers been completed, Union Carbide's 'benefit of the bargain' *would not have been affected by changes in the market price of oil.* The price formula which set the contract price paid by Consumers traced the price that union Carbide paid to Petrosar. No matter what happened to Petrosar's prices, Union Carbide could pass through the change in prices to Consumers. *It was guaranteed its fixed profit on the contract and no more.* Any windfall gains that might arise from rapid price changes would be realized by Petrosar, not Union Carbide. For this court to fundamentally alter this allocation of contractual benefits between the parties by giving Union Carbide vastly greater returns than were provided for by its contract with Consumers would fly in the face of the UCC's basic premises and be manifestly unjust. In short Union Carbide was *guaranteed a riskless, fixed profit* under the terms of the contract and they should not receive the benefit of price fluctuations whose risk they did not assume.
>
> Finally, the court finds that market price damages will overcompensate Union Carbide. By overcompensation, the court means that Union Carbide would receive greatly more than the riskless benefit of the bargain they would have received if the contract had been performed.

*Id.* (emphasis added). The court distinguished the *Trans World* decision in that, unlike this case, the *Trans World* parties had expressly bargained for the allocation of the risk of market price changes—thereby making the *Trans World* opinion irrelevant to the case at hand. *Id.* at 1504. The court concluded by requiring that Union Carbide's damages be calculated under the lost profits formula of § 2–708(2). *Id.*

*iv. Diversified Energy, Inc. v. Tennessee Valley Authority.* The final and most recent case dealing with the specific problem of when it is appropriate to 'force' an aggrieved seller to take lost profits damages under § 2–708(2) where § 2–708(1) would overcompensate the seller is *Diversified Energy, Inc. v. Tennessee Valley Authority,* 339 F.3d 437 (6th Cir.2003). In *Diversified Energy,* the plaintiff, Diversified Energy, Inc. ("Diversified") entered into a long-term coal supply contract with Tennessee Valley Authority ("TVA") in which Diversified was to supply TVA with 10,000 tons of coal per week from August

1990 through March 27, 1996. *Id.* at 440. According to the agreement, Diversified was to obtain the coal required to fulfill the contract only from Sigmon Coal Company ("Sigmon"). *Id.* Diversified entered a simultaneous contract with Sigmon in which Diversified was paid a fixed commission of $0.98 per ton of coal delivered to TVA. *Id.* Diversified was then obligated to pay $0.22 for each ton delivered to TVA, Billy Evans as compensation for assigning Diversified the contract in June 1980.[13] *Id.* at 446. TVA repudiated the contract on March 19, 1993. *Id.* at 440. Pursuant to the Diversified–TVA contract, the matter was submitted to a Disputes Contracting Officer. *Id.* Diversified claimed two specific proposed measures of damages: (1) the contract/market differential of $5.13 per ton, resulting in approximately $8 million in damages; and (2) $14 per ton for the 1,570,000 tons remaining, totaling approximately $21 million, which represented the liquidated damages Diversified would be entitled to if TVA was found to have unilaterally terminated the contract. *Id.* The Disputes Contract Officer rejected most of Diversified's proposed damages calculations and further found that Diversified had violated a provision of the contract which gave TVA the right to terminate the agreement. *Id.* In March 1997, Diversified appealed the Disputes Contracting Officer's decision to the United States District Court for the Eastern District of Tennessee. *Id.* at 441. Though procedurally the case becomes complex and convoluted at this point, for purposes of this case summary it is important only to note that *eventually* the district court, on a motion for summary judgment, awarded Diversified $1,193,200.00, plus interest, reflecting the $0.98 per ton commis-

sion it would have received from Sigmon if TVA had performed less the $0.22 per ton that Diversified was obligated to pay to Billy Evans. *Id.* at 443. Among other things, Diversified appealed this damage award to the Sixth Circuit Court of Appeals. *Id.*

In affirming the damages award ordered by the district court, the Sixth Circuit made the following observations:

A non-breaching party is entitled to be placed in the same position it would have enjoyed had the defendant abided by the contract, but is not entitled to more than the benefit of his bargain. *See, e.g., San Carlos Irrigation & Drainage Dist. v. United States,* 111 F.3d 1557, 1562–62 (Fed.Cir.1997); *Rodgers v. Fisher Body Div. Gen. Motors Corp.,* 739 F.2d 1102, 1107 (6th Cir.1984). A damage award which fails to adhere to this principle is unreasonable as a matter of law. *See Cincinnati Fluid Power, Inc. v. Rexnord, Inc.,* 797 F.2d 1386, 1393 (6th Cir. 1986). The UCC, including § 2–708, has adopted this philosophy. *See, e.g., Nobs Chem., U.S.A., Inc. v. Koppers Co.,* 616 F.2d 212, 215 (5th Cir.1980).

Diversified relies principally on *Trans World Metals, Inc. v. Southwire Co.,* 769 F.2d 902, 908 (2d Cir.1985) to support its argument that it is entitled to damages under § 2–708(1). That case is not applicable, however. Unlike the plaintiff in *Trans World Metals,* Diversified did not assume any risk that the market price of coal would increase. Rather, any risk was assumed, if at all, by Sigmon—the only authorized producer of the coal under the Contract. Therefore, Diversified was not entitled to damages based on the contract/market price dif-

---

**13.** The payments were structured as follows: (1) TVA paid Diversified the full contract price (what exactly the full contract price was is never disclosed in the opinion); (2) Diversified would turn around and pay Sigmon the full purchase price less its commission of $0.98 per ton; (3) Diversified would then pay $0.22 per ton to Billy Evans pursuant to the assignment agreement.

ferential under § 2–708(1). *See Nobs Chem.*, 616 F.2d at 215; *see also Union Carbide Corp. v. Consumers Power Co.*, 636 F.Supp. 1498, 1501–02 (E.D.Mich. 1986). Because Diversified would have received only $0.76 per ton of coal had the Contract been performed, the district court properly limited its damages to an amount based on that figure.

*Id.* at 446–47.

 *v. Application.* The cases discussed illustrate some factors a court should consider when trying to determine if the plaintiff-seller should be forced to take lost profits damages when contract/market damages would give the seller a windfall. As gleaned from the summarized cases above that have addressed this issue, the key reasons for restricting an aggrieved seller to lost profits damages are: (1) contract/market damages would clearly overcompensate the seller; (2) the seller has insulated itself from changes in the market price by entering into a contract with a supplier to fix its market price; (3) the seller's expectation interest is more accurately met by lost profits damages than contract/market damages; (4) the seller doesn't currently have possession of the goods remaining to be delivered under the contract; and (5) the seller is not contractually obligated to accept goods from its supplier, or could pay the supplier to retain the goods pursuant to the seller's contract with the supplier. On the other hand, *Trans World* provides the court with factors dictating when lost profits damages should not be imposed on the seller: (1) where it isn't clear that the contract/market formula would, in fact, overcompensate the seller; (2) the seller is not contractually insulated from fluctuations in market

price; and (3) the state in which the federal court sits has not interpreted § 2–708 to allow for the imposition of "lost profit" damages where the seller has proven the elements necessary for entitlement to contract/market damages.

 As a preliminary matter, the court first addresses the fact that Iowa has not yet explicitly interpreted § 2–708 (Iowa Code § 554.2708) such that the seller could be forced to take lost profits damages where contract/market damages would clearly provide a windfall to the seller, such as the Lesses argue here. Unlike the *Trans World* court, this court does not find the fact that Iowa law has not yet interpreted § 2–708 in this manner fatal to the Lesses' argument that Purina should be restricted to "lost profit" damages. "Where neither legislature nor the highest court in a state has addressed an issue, the federal [district] court must determine what the highest state court would probably hold were it called upon to decide the issue." *Hazen v. Pasley*, 768 F.2d 226, 228 (8th Cir.1985); *cf. Alumax Mill Prods., Inc. v. Congress Fin.Corp.*, 912 F.2d 996, 1007 (8th Cir.1990) (recognizing that where state law claims are litigated in federal court under diversity jurisdiction that "[t]he district court's interpretation of local law is entitled to great weight" and will not be reversed unless "the district court has not correctly applied the local law or unless its interpretation of local law is fundamentally deficient in analysis or otherwise lacking in reasoned authority.") (citations and quotation omitted). Therefore, it is the province of a district court sitting in diversity to fashion a 'best guess' as to what the highest state court would rule were it deciding the case.[14] In spite of the

14. The court notes that Iowa law, and the Local Rules, allow for a district court, on the motion of the parties, or on its own motion, to certify a question of state law to the Iowa Supreme Court. *See* Iowa Code § 684A.1

(2003); LR 83.1 (2003). But, the determination of "[w]hether a federal district court should certify a question of state law to the state's highest court is a matter committed to the discretion of the district court." *Leiberk-*

fact that there is no Iowa case law interpreting § 2–708 in the manner proposed by the Lesses, the court determines that were the Iowa Supreme Court faced with a factual scenario akin to those presented in *Nobs Chemical, Union Carbide* or *Diversified Energy*, it would follow the analysis of those cases and interpret § 2–708 to restrict the seller to lost profits damages. The court is confident that the Iowa Supreme Court would promote this interpretation, in light of the movement to amend § 2–708 to explicitly require such an interpretation. *Accord* Linda J. Rusch, *Is the Saga of the Uniform Commercial Code Article 2 Revisions Over? A Brief Look at What NCCUSL Finally Approved,* 6 DEL. L. REV. 41, 84 (2003) (stating that the National Conference of Commissioners on Uniform State Laws ("NCCUSL") proposed a comment to section 2–708 which "ultimately leav[es] to the courts to determine in any particular case whether using any particular measurement would result in the seller being overcompensated."); Task Force of the A.B.A. Subcommittee on General Provisions, Sales, Bulk Transfers, and Documents of Title, Committee on the Uniform Commercial Code, *An Appraisal of the March 1, 1990, Preliminary Report of the Uniform Commercial Code Article 2 Study Group,* 16 DEL. J. CORP. L. 981, 1221, 1224 (1991) (noting the recommendation by the Task Force that the Study Group's recommendation to the Drafting Committee "include the suggestion that the buyer should be able to compel the seller to use section 2–708(2) in all cases in which section 2–708(1) would overcompensate the seller" as the Task Force "believe[s] that any other result would contravene the liberal administration of remedies mandated by section 1–106" and citing *Nobs Chemical* and *Union Carbide* in support of its

position); *but see* John D. Clark, *The Proposed Revisions to Contract–Market Damages of Article Two of the Uniform Commercial Code: A Disaster Not a Remedy,* 46 EMORY L.J. 807, 808 (1997) (disagreeing with the NCCUSL's proposed revisions to § 2–708 that would eliminate the option of contract/market damages where it would provide the seller with a windfall because doing so 'twists' the real meaning of section 1–106); Robert E. Scott, *The Case for Market Damages: Revisiting the Lost Profits Puzzle,* 57 U. CHI. L. REV. 1155, 1178 (1990) (discrediting the *Nobs Chemical* holding as having the effect of encouraging buyers to breach opportunistically and create instability). The court adjudges that the Iowa Supreme Court, if faced with a factual situation warranting the imposition of lost profits damages, would follow the trend towards imposing such a restriction. Therefore, the fact that this specific issue has not yet been addressed by the Iowa Supreme Court does *not* preclude restricting a seller to lost profit damages if it is warranted by the relative positions of the parties. *See Diversified Energy,* 339 F.3d at 446–47 (citing *Nobs Chemical* and *Union Carbide* to support Sixth Circuit Court of Appeal's determination that seller should be restricted to lost profits remedy, though not citing any Tennessee, or other state, case law interpreting § 2–708 in this manner); *Nobs Chemical,* 616 F.2d at 214 (restricting seller to lost profits damages even where there was no state's law directly on point); *Union Carbide Corp.,* 636 F.Supp. at 1501–02 (relying on *Nobs Chemical* for support in forcing seller to take lost profits damages, despite fact there was no Michigan case law addressing the issue).

*neckt v. Bridgestone/Firestone, Inc.,* 980 F.Supp. 300, 309 (N.D.Iowa 1997) (citation and quotation omitted); *see also Catipovic v. Peoples Cmty. Health Clinic, Inc.,* 239

F.Supp.2d 917 (N.D.Iowa 2003). In this instance the court determines that the issue need not be certified to the Iowa Supreme Court.

A close examination of the Agreement in this case, and the accompanying Purina–Perennial Pork contract, shows that the factual situation is similar, though not identical, to those detailed in *Nobs Chemical, Union Carbide* and *Diversified Energy*. This case is unique in that the court could find no other case involving the appropriate damage award of a seller who bargained to be insulated from market fluctuations, yet knowing that the buyers had repudiated, refused an option extended by the supplier to buy out of the third-party agreement, and therefore remained contractually bound to accept the contract goods from its supplier after the buyer's breach. Like the sellers in *Nobs Chemical, Union Carbide* and *Diversified Energy*, Purina, by entering into a fixed-price contract with Perennial Pork for purchase of the weanling pigs at $32.00 each, effectively insulated itself from any fluctuation in the market price of weanling pigs. Purina did not assume any risk that the market price of weanling pigs would fluctuate throughout the term of the Agreement with the Lesses. *See Diversified Energy*, 339 F.3d at 447. If all parties had performed their roles, the only party who would be affected by fluctuations in the market price would be the supplier, Perennial Pork and/or Concord Pork. Had the Lesses performed, Purina's expected "benefit of the bargain" would not have been affected by a fluctuation in the market price of weanling pigs. *See Union Carbide*, 636 F.Supp. at 1503. The fact that Purina contractually insulated itself from market fluctuations puts it in contention for restriction to lost profits damages—but

in assessing the appropriate measure of damages the court must also consider Purina's expectancy interest in remaining insulated from the market in tandem with the buyout option offered by Concord mere days after the Lesses' repudiation.

The court will first consider Purina's expectancy interest standing alone. When Purina simultaneously entered into Agreements with the Lesses and Perennial, Purina's expected "benefit of the bargain" was to either sell the Lesses all of the feed products necessary to raise the weanling pigs they purchased to slaughter weight, or, if the Lesses decided not to use Purina feed products, to receive an additional $3.00 per weanling pig. Additionally, regardless of whether the Lesses used Purina feed and nutritional products, Purina also expected to recoup, from the Lesses, the purchase price of $32.00 per weanling pig that it paid to acquire the weanling pig from Perennial Pork. One *key difference* in this case that makes Purina *unlike* the sellers in *Nobs Chemical, Union Carbide* and *Diversified Energy*, is that Purina is contractually obligated to purchase the weanling pigs from Perennial Pork at $32.00 a head, for the remainder of the term of the contract—through December 2007.[15] Purina is *not* excused from performance under its contract with Perennial merely because the Lesses' repudiated their contract with Purina. The fact that Purina is contractually bound to purchase the weanling pigs that it was to sell the Lesses [16] necessitates consideration of an additional expectancy interest that was part of Purina's 'benefit of the bargain':

---

**15.** The term of both the Purina–Less Agreement and the Purina–Perennial Agreement is the same—from approximately November 1997 through December 2007.

**16.** Also worth reiterating is the fact that when the Lesses entered into the Agreement with Purina, they were aware of the nature and

content of Purina's contractual arrangement with Perennial Pork—this is evidenced in that Purina's agreement with Perennial is referenced in the Purina–Less Agreement, and the Purina–Less Agreement specifically requires that the weanling pigs were, barring extraordinary circumstances, to come from Perennial Pork.

Purina's expectation that it would remain insulated from market fluctuations. Consideration of this expectation interest did not come into play in *Nobs Chemical, Union Carbide* or *Diversified Energy* because in those cases the plaintiff-sellers were not required to accept the contract goods from their suppliers; hence, the breach by the buyers did not compromise the sellers' expected market insulation. In this case, the Lesses' repudiation resulted in Purina losing its 'contracted for' market insulation, in that Purina, in order to recoup the cost of the weanling pigs it had to purchase from Perennial Pork, is now required to resell the weanling pigs *subject to* the market for weanling pigs; *subject to* the very market fluctuations that it *expected to be insulated against* as a benefit of its bargain with the Lesses. Regardless of the Lesses' repudiation, Purina is still contractually required to pay a flat $32.00 purchase price for the weanling pigs to its supplier, and in order to break even it must sell these weanling pigs at whatever the market dictates they are worth at the time—whether that be $8.00 each or $38.00 each. The Lesses' repudiation stripped Purina of its contracted for security from market price fluctuations. If there were no other factors to consider, the court would comfortably find that Purina was entitled to contract/market damages as the Lesses' repudiation destroyed Purina's expectancy interest and Purina was helpless to stop it.

However, looking at Purina's expectancy interest in tandem with the buyout offer by Concord Pork it becomes clear that the Lesses are not the keepers of Purina's expectancy interest—almost serendipitously, *mere days* after learning of the Lesses' repudiation, Purina was given the option by Concord Pork to buy out of the remainder of the contract between Purina and Concord for the sum of $100,000.00. Dave Hoffman, president of Concord Pork, testified that on September 1, 2002, the day that he purchased Concord Pork, and the day that Concord Pork acquired the rights and obligations of the Purina–Perennial Agreement through a purchase of all of Perennial Pork's assets, Concord offered Purina the option of buying out of the supply agreement: [17]

A: When I bought Concord there was a discussion and we felt at the time that the contract has some value to us as a purchaser, and so we asked Purina for $100,000 for the contract and that was not accepted, so we left the contract in place....

Q: Do I understand your testimony correctly then that *at the time of the closing you offered to let Purina out of the contract for $100,000?*

A: *Yes.*

Defendant's Supplemental Statement of Facts in Resistance to Motion for Summary Judgment, Doc. No. 38, Deposition of David Hoffman at pg. 19–20. Though the Lesses' repudiation thrust Purina into the market, Purina remained the master of its own destiny, as it could have chosen to take the buyout offer by Concord and preserved its expected market insulation. Curiously, rather than accept the buyout offer by Concord—which would have insured protection of Purina's expectancy interests—Purina made the choice to remain vulnerable to the market *in spite of* the fact that it knew that the Lesses would not be able to fulfill their end of the contract bargain. Purina said it best: "There was no way to know whether [Purina] would be able to find another buyer or, if not,

---

**17.** In Purina's supplemental brief in support of summary judgment it refers to this buyout option as an "alleged offer," but does not rebut this factual assertion with testimony or other admissible evidence. As Purina has not rebutted the Lesses' showing of such an offer on the part of Concord Pork, the fact is undisputed for purposes of the court's analysis.

whether it would make or lose money by re-selling the pigs on the open market." Plaintiff's Second Supplemental Brief in Support of Motion for Summary Judgment, Doc. No. 39, at pg. 2. While it is true that the Lesses' repudiation initially forced Purina into the uncertain ebb and flow of the marketplace, Purina, with full knowledge that the Lesses were financially unable to accept any more weanling pigs, made the conscious choice to remain in this position by refusing the buyout option offered by Concord. In this instance, where Purina itself distinctly declined the opportunity to protect its expectancy interest in market insulation, the court finds no reason why it should protect the expectancy interest Purina perfunctorily cast aside through an award of contract/market damages.

▄▄▄ Some scholars have worried that restricting an aggrieved seller to lost profits damages would lead to opportunistic breaching by the buyer, *see* Scott, *supra,* 57 U. CHI. L. REV. at 1178 (discrediting the *Nobs Chemical* holding as having the effect of encouraging buyers to breach opportunistically and create instability), however in this instance it appears as though *not* restricting Purina to lost profits damages would encourage large, corporate sellers not to mitigate their damages, but rather hold out for 'guaranteed' contract/market damages—as appears to be the case in this instance. Key in this determination is the fact that Purina *opted* to continue receiving weanling pigs from Concord Pork, with full knowledge that it would have to sell, subject to the market, the weanling pigs the Lesses could no longer purchase to a third party. Further enforcing the decision to award only lost

profits is the fact that the Lesses' repudiation and the buyout offer occurred mere days apart—thus the Lesses' repudiation unilaterally affected Purina's expected market insulation for only a handful of days. If Purina were granted contract/market damages, Purina would receive the $3.00 profit per weanling pig, the contract/market differential of $16.62 per weanling pig *and* any amount Purina would receive for selling the weanling pigs to a third-party rather than to the Lesses—this surely would constitute a windfall to a seller, such as Purina, that chose not to protect its expected market insulation.[18] *See Union Carbide,* 636 F.Supp. at 1501–03. Under Iowa law, as is echoed in the UCC, "the nonbreaching party's recovery 'is limited to the loss he has actually suffered by reason of the breach; he is not entitled to be placed in a better position than he would have been in if the contract had not been broken.'" *Midland Mut. Life Ins. Co. v. Mercy Clinics, Inc.,* 579 N.W.2d 823, 831 (Iowa 1998) (quoting 22 AM. JUR. 2D *Damages* § 45 (1988)); *see* IOWA CODE § 554.1106 (providing that the "aggrieved party may be put in as good a position as if the other party had fully performed"—identical to language in U.C.C. § 1–106); *Lyons v. Midwest Glazing, L.L.C.,* 235 F.Supp.2d 1030, 1050 (N.D.Iowa 2002) (citing *Midland Mutual*); *Grunwald v. Quad City Quality Serv., Inc.,* 662 N.W.2d 370 (table), 2003 WL 182957 at *2 (Iowa Ct.App. Jan.29, 2003) ("A party is not entitled to use the breach to better its position by recovering damages not actually suffered."); *Trumm v. Feeder's Supply, Inc.,* 2002 WL 31640755 at *3–4 (Iowa Ct.App. Nov.25, 2002) (citing *Midland Mutual*). The only actual loss

---

**18.** This overcompensation is evident in evaluating the approximate damages under each of the formulas. Contract/market damages of $16.62 per weanling pig would amount to close to $1.3 million, about *four times* more than the approximate $300,000 award under the lost profits formula. This disparity is exacerbated by the fact that at this time another entity, Plymouth Feed Company, purchases from Purina almost 100% of the weanling pigs that Purina purchases from Concord Pork—most often at a profit to Purina.

caused by the Lesses' repudiation, in light of Concord's almost simultaneous buyout offer, is Purina's lost profits. The Lesses are not responsible for Purina's *election* to remain contractually bound to receive weanling pigs from Concord, and consequently Purina's *assumption of the risk* of selling those pigs subject to a fluctuating market. In summary, the court has found that: (1) by simultaneously entering into agreements with both Perennial Pork (now Concord Pork) and the Lesses, Purina effectively insulated itself from market fluctuations; (2) less than a month after the Lesses' repudiation, Purina was given the option to buyout of the contract with its supplier; and (3) an award of contract/market damages would clearly overcompensate a seller in Purina's position. Therefore, like the courts in *Nobs Chemical, Union Carbide* and *Diversified Energy*, this court finds that based on undisputed material facts, considerations of equity require that Purina be restricted to lost profits damages.

### c. Application of the lost profits damages formula

 *i. Calculation of Purina's lost profits damages.* Purina, in both its summary judgment motion and reply, asserts that the total number of weanling pigs remaining under the contract at the time of the Lesses' repudiation is 76,250. The Lesses have not contested this figure. In its reply brief, Purina proposed a reduction in the total number of pigs remaining under the contract by a percentage to address the Lesses' argument that the number should be reduced to accommodate the fact that some of the pigs in the shipment would likely be graded 'substandard' or rejected, in which case the Lesses would be under no obligation to purchase them. The unrefuted deposition testimony of David Hoffman, owner of Concord Pork, later established that the

maximum percentage of substandard and rejected pigs was actually 3.0%. Hoffman Deposition at 32–33. Purina suggested reducing the total number of pigs remaining under the contract by this maximum percentage, thus making the grand total of weanling pigs remaining under the Agreement at the time of the Lesses' repudiation 73,963; though Purina's suggestion of taking the maximum deduction was made only under an assumed award of a contract/market damages formula. As both parties agree that a reduction should be taken, the court likewise finds reduction of the total number pigs remaining under the Agreement to account for the potential substandard and rejected weanling pigs is proper. Further, rather than using the maximum percentage of 3.0%, the court finds that the 'average' percentage of substandard or rejected pigs, or half of the maximum percentage—1.50%—is appropriate. Reducing the total number of weanling pigs remaining under the contract by 1.50% results in a total number of weanling pigs remaining under the Agreement of 75,106. The contract price is $35.00 per weanling pig, which represents the $32.00 flat rate plus the additional $3.00 per pig fee for not feeding the pig Purina feed products. The profit per pig, therefore, is $3.00 each. Multiplying the lost profit per pig ($3.00) by the number of weanling pigs (75,106) yields a total damage award of $225,318.00. However, as the Lesses correctly assert, Iowa case law supports the reduction of future damages to present value, *see CHR Equip. Fin., Inc. v. C & K Transp., Inc.,* 448 N.W.2d 693, 695 (Iowa Ct.App.1989), and therefore the portion of the total damage award that represents future damages must be discounted to present value. The damages accruing from the date of the Lesses' repudiation on August 21, 2002, through the date of the judgment in December 2003, $57,639.49,[19] is not reduced to present val-

19. The court reached this figure by first determining that 64.5 months were left in the

ue, but is awarded outright. The remainder represents future damages, and must be discounted to present value. As the court could find no Iowa statutory or case law specifying what discount rate is to be applied to breach of contract actions, and neither of the parties has proposed a discount rate, the court will apply the U.S. Treasury Maturity Index bond rates reported on the date closest to the judgment date. Discounting future payments to present value results in an award of $158,-452.66 [20] in future damages. The total damage award for the Lesses' repudiation is therefore, $216,092.15, of which $57,639.49 represents present damages and $158,452.66 represents future damages.

**■■■■ ii. Prejudgment and post-judgment interest.** In a diversity action, state law governs whether prejudgment interest should be awarded, and if so, at

what rate. *See Tarnavsky v. Tarnavsky,* 147 F.3d 674, 679 (8th Cir.1998) (recognizing that North Dakota law applied to the question in that diversity case); *Berglund v. State Farm Mut. Auto. Ins. Co.,* 121 F.3d 1225, 1230 (8th Cir.1997) (recognizing that Iowa Code § 535.3 applied to the question of prejudgment interest in a diversity case that was governed by Iowa law). Therefore, Iowa law applies to the availability of prejudgment interest in this case. The Iowa Supreme Court has stated that "[t]he award of [prejudgment] interest is mandatory and should be awarded even when interest has not been requested." *Hughes v. Burlington N. R.R. Co.,* 545 N.W.2d 318, 321 (Iowa 1996) (citing *In re Marriage of Baculis,* 430 N.W.2d 399, 401 (Iowa 1988)). Prejudgment interest is awarded not as a penalty, but "to prevent persons obligated to pay money to another from profiting through delays in the litiga-

Agreement term after the Lesses' repudiation in August 2002 (counting the end of August 2002 as 0.5 months). Then, assuming an equal number of pigs would be delivered each of the remaining 64.5 months, the court divided the total damage award of $225,318.00 by 64.5 to determine that the amount to be paid per month would be $3,493.30 (actually the number generated, with all significant figures, is $3493.3023558 this is actually the number used in the calculations). The period of time from August 2002 through the judgment in December 2003, accounts for 16.5 of the total remaining months, and multiplied by the amount paid per month of $3,493.30, equals $57,639.49 in past and present damages that should not be discounted to present value.

**20.** The court used the following U.S. Treasury Maturity Index rates as published in the Federal Reserve H15 Report on Thursday, December 22, 2003—the last date, as of the date of the judgment, for which rates were reported—as reported at *http://www.federalreserve.gov/releses/h15/update:* 1–year = 1.24%; 2–year = 1.85%; 3–year = 2.38%; and 5–year = 3.17%. As the last year of the Purina–Less agreement, 2007, is four years away, and as there is no 4–year treasury constant maturity index, the 3–year and 5–year rates were averaged to give a rate of 2.775% for the fourth year. The formula used to determine the present value of the future lost profits is: $P = X / [(1 + d)^N]$. Where P is the present value, X is the future value of the sum to be discounted, d is the discount rate and N is the number of years hence that the money is available. 1 WILLISTON ON CONTRACTS § 6–8, pg. 351. For 2004, 2005, 2006 and 2007, X was $41,919.63 (12 × $3493,3023558). Rather than reduce the lost profit damages on a monthly basis, the court did so on a yearly basis—as if the lost profits for the entire year were due on the last day of that year, thus making the lost profits amount for each of the remaining years the same at $41,919.63. The following are the calculations for each of the respective years:

- 2004 Present Value = $41,919.63/[(1 + 0.0124)^1] = $41,406.19.
- 2005 Present Value = $41,919.63/[(1 + 0.0185)^2] = $40,410.61.
- 2006 Present Value = $41,919.63/[(1 + 0.0238)^3] = $39,063.58.
- 2007 Present Value = $41,919.63/[(1 + 0.02775)^4] = $37,572.28.
- TOTAL = $158,452.66.

tion." *Id.* (citation and quotations omitted).

The controlling state law in this case is Iowa Code § 535.3(1), which provides:

**535.3. Interest on judgments and decrees**

1. Interest shall be allowed on all money due on judgments and decrees of courts at a rate calculated according to section 668.13, except for interest due pursuant to section 85.30 [workers' compensation] for which the rate shall be ten percent a year.

Iowa Code § 535.3(1) (2003). As stated by section 535.3(1), the appropriate interest rate is calculated under 668.13, which reads in pertinent part:

**668.13 Interest on judgments**

Interest shall be allowed on all money due on judgments and degrees on actions brought pursuant to this chapter, subject to the following:

1. Interest, *except interest awarded for future damages,* shall accrue from the date of the commencement of the action.

　※　　※　　※　　※　　※　　※

3. Interest shall be calculated as of the date of judgment at a rate equal to the one-year treasury constant maturity index published by the federal reserve in the H15 report settled immediately prior to the date of the judgment plus two percent. The state court administrator shall distribute notice monthly of that rate and any changes to that rate to all district courts.

4. Interest awarded for future damages shall not begin to accrue until the date of the entry of the judgment.

Iowa Code § 668.13(1), (3), (4) (2003) (emphasis added). The one-year treasury constant maturity index, as published by the federal reserve in the H15 report update,[21] as of December 18, 2003, the date immedi-

ately prior to the date of judgment, was 1.24. Therefore, under section 668.13(3), the prejudgment interest rate would be 3.24%. Accordingly, prejudgment interest at a rate of 3.24% per annum is awarded to Purina as to the damages awarded under § 2–709, and the portion of the damage award for the Lesses' repudiation under § 2–708(2) that does not represent future damages, from the date the suit was commenced on October 28, 2002. *See* Iowa Code § 668.13(1) & (3). As to the portion of the judgment that represents future damages, $158,452.66, postjudgment interest at the rate of 3.24% will accrue from the date of this judgment until the judgment is satisfied by the Lesses. *See* Iowa Code § 668.13(1) & (4).

## IV.　CONCLUSION

For the reasons stated above, Purina's motion for summary judgment is **granted.** IT IS ORDERED AND ADJUDGED that plaintiff Purina shall recover as follows:

1. **Damages against the Lesses, jointly and severally, under Iowa Code § 554.2709 for the price of goods accepted by the Lesses in the amount of $1,432.00 with interest to accrue at a rate of 3.24% per annum from October 28, 2002.**

2. **Damages against the Lesses, jointly and severally, under Iowa Code § 554.2708(2) for the Lesses' repudiation in the amount of $57,639.49 with interest to accrue at a rate of 3.24% per annum from October 28, 2002.**

3. **Future Damages against the Lesses, jointly and severally, under Iowa Code § 554.2708(2) for the Lesses' repudiation in the amount of $158,452.66 with interest to accrue at a rate of 3.24% per annum from December 22, 2003.**

---

**21.** The H15 report referred to in the opinion was found at the federal reserve's website·at:

*http://www.federalreserve.gov/releses/h15/update.*

Consequently, as all matters in this case have been disposed of on summary judgment, the bench trial currently set for January 5, 2004 is cancelled, and the defendants' pending Motion in Limine (Doc. No. 36) is dismissed as moot.

**IT IS SO ORDERED.**